George HART and Hart Motor Express, Inc., Plaintiffs,

v.

INTERSTATE COMMERCE COMMISSION and the United States of America, Defendants,

v.

MIDWEST MOTOR EXPRESS, INC., a corporation, Glendenning Motorways, a corporation, E. O. Kavli, dba Minot-Bottineau Trucking Service, Inc., Ray Fritz, dba Fritz Truck Line, Hanson Transfer, Inc., a corporation, Marvin Baska and Ruth Baska, dba M & R Transfer, Intervenors.

No. 4-63-Civ. 15.

United States District Court
D. Minnesota,
Fourth Division.

Feb. 25, 1964.

Donald A. Morken, Clay R. Moore and Mackall, Crounse, Moore, Helmey & Holmes, Minneapolis, Minn., for plaintiffs.

Robert W. Ginnane, Gen. Counsel, and Francis A. Silver, Assoc. Gen. Counsel for Interstate Commerce Commission, for defendant Interstate Commerce Commission.

William J. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, and Miles W. Lord, U. S. Atty., for defendant the United States.

F. J. Smith and Fleck, Smith, Mather & Strutz, Bismarck, N. D., for Midwest Motor Express, Inc., intervenor.

Gene P. Johnson and Van Osdel & Foss, Fargo, N. D., for Glendenning Motorways, a corporation; E. O. Kavli, dba Minot-Bottineau Trucking Service, Inc.; Ray Fritz, dba Fritz Truck Line; Hanson Transfer, Inc., a corporation; Marvin Baska and Ruth Baska, dba M & R Transfer, intervenors.

Before BLACKMUN, Circuit Judge, DEVITT and LARSON, District Judges.

LARSON, District Judge.

This is an action to review a final Order of the Interstate Commerce Commission and for a mandatory injunction directing the defendant Commission to take jurisdiction of the subject matter in the two applications in question. Jurisdiction in this Court is based on 49 U.S.C. § 305(g), 5 U.S.C. § 1009(c) and 28 U.S.C. § 2284.

On December 14, 1959, Hart Motor Express, Inc., of St. Paul (Hart) and Fargo Freight Trucking, Inc., of Fargo, North Dakota, (Trucking) made a joint application in Docket No. MC–F–7399 seeking authority under 49 U.S.C. § 5(2) for Hart's purchase of all of the capital stock of Trucking and for the merger into Hart of the operating rights and property of Trucking. In the same application George Hart, the owner and controller of Hart, sought authority to control Trucking by the transaction described in more detail later.

In Docket No. MC–78643 (Sub. No. 43), also filed on December 14, 1959, Hart applied for a certificate of public convenience and necessity under 49 U.S.C. § 307 seeking authority for operations corresponding to the authority held at that time by Trucking.

Docket No. MC–F–7399 will be referred to as the Purchase application and Docket No. MC–78643 (Sub. No. 43) will be referred to as the PCN application.

Both applications were referred for hearing, and the hearings on the two applications were held simultaneously on April 25, 1960, and on October 3 and 4,

1960. The Purchase application was heard before two Examiners, one presiding on April 25, the other on October 3 and 4, while the PCN application was heard before Joint Board No. 300, composed of a member from North Dakota.

The Hearing Examiner's Report of September 8, 1961, on the Purchase application recommended dismissal for lack of jurisdiction, and the Report of Joint Board No. 300 recommended on September 12, 1961, that the PCN application be denied. Division 3 of the Commission held that the Commission was without jurisdiction to adjudicate the matter, found that the Purchase application did not present a transaction within the scope of 49 U.S.C. § 5(2) (a) and that the "related application" in the PCN case should be dismissed. 90 M.C.C. 527 (August 31, 1962). A petition by Hart for reconsideration of this Order was made and denied. Pursuant to Commission authority Hart has assumed temporary management of Trucking since early 1960, and this has been continued through an Order signed by the Honorable Edward J. Devitt on February 11, 1963, temporarily suspending the Commission's Orders directing the cessation of Trucking's interstate and foreign operation and of the Hart temporary management of Trucking.

The "final order" of the Commission before this Court for review is the Report of Division 3 of the Commission.

Hart is a large carrier operating in interstate and foreign commerce in the area between Chicago and Billings, Montana. It holds intrastate authority in North Dakota. Trucking is a much smaller carrier which operates only intrastate in North Dakota. It carries interstate and foreign cargoes between points in North Dakota ("interlining") under what is referred to as second proviso authority. Section 206(a) of the Interstate Commerce Act (49 U.S.C. 306(a)) provides in part:

"(a) (1) Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provi-

sions of this chapter shall engage in any interstate or foreign operations on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission authorizing such operations: * * *."

Until 1962[1] the section contained this proviso:

"And provided further, That this paragraph shall not be so construed as to require any such carrier lawfully engaged in operation solely within any State to obtain from the Commission a certificate authorizing the transportation by such carrier of passengers or property in interstate or foreign commerce between places within such State if there be a board in such State having authority to grant or approve such certificates and if such carrier has obtained such certificate from such board. Such transportation shall, however, be otherwise subject to the jurisdiction of the Commission under this chapter."

Trucking holds North Dakota Certificate No. 235 and at least since 1958 has been operating as a "second proviso" carrier.

The Commission largely adopted the findings and the recommendation of the Hearing Examiner in the Purchase Case, and it summarized these findings as follows:

"In recommending dismissal of the application in No. MC–F–7399, the examiner found that at the time Trucking commenced operations under the proviso, and until Hart commenced the temporary authority operations, it was under the dominant influence and control of one Everett Collins, (Collins) an individual in control of Collins Truck Line, (Truck Line) a multistate motor carrier; that the proviso operations were unlawful from their inception, and

Trucking lacked carrier status; and that the Commission was without jurisdiction to entertain the application under section 5. In view of such recommended dismissal, the joint board denied the application in No. MC–78643 (Sub-No. 43)."

The statutory pattern upon which the Commission's determination that Trucking lacked carrier status appears to be as follows. The second proviso covers carriers "*lawfully engaged* in operation solely within any State" (emphasis added) and if a carrier is not lawfully engaged in such operation, it cannot obtain second proviso authority and is thus not covered by the Act. The merger section of the Act, however, applies only to two or more *carriers,* 49 U.S.C. § 5(2) (a) (i), and a carrier is defined, with reference to motor carriers, as a motor carrier "subject to chapter 8 of this title." 49 U.S.C. § 5 (13). Hence, if Trucking is not a lawful second proviso carrier, it is not a carrier for purposes of the Act, and it can have no "properties or franchises" which the Commission could have authorized Hart to purchase under section 5. See Forbes Transfer Co., Inc.—Purchase—R. E. Lane and Leo Ferrell, 87 M.C.C. 601, 604–05 (1961).

The Commission's finding that Trucking was controlled by one Everett Collins, an individual in control of a multistate carrier, is crucial, then, because it is the basis for the dismissal due to lack of jurisdiction.

Section 5(4) of the Act (49 U.S.C. § 5(4)) provides:

"It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, * * *."

1. This provision was in force at all times relevant to the instant action.

The plaintiffs argue that it was improper for the Commission to dismiss the Purchase application on the grounds of unlawful control, because the Act provides a procedure [2] for the investigation and consideration of unlawful control which the Commission should have followed. This argument assumes that the section 5(7) procedure is the sole means by which a section 5(4) violation can become relevant. The Commission, however, has repeatedly taken the position that unlawful operations bear on whether a section 5(2) transaction is consistent with the public interest. E. g., Neptune Storage, Inc.—Purchase—E. H. Warren Co., 80 M.C.C. 235, 238 (1959); M. P. McLean—Control: McLean Trucking Co. —Purchase—Atlanta, Columbus, Albany Motor Lines, Inc., 60 M.C.C. 475, 486 (1954).

The second proviso of section 206(a) of the Act (49 U.S.C. § 306(a)) must be construed in the light of other pertinent provisions of the Act which declares the national transportation policy, "particularly section 5(4)." Buckeye Express, Inc. v. U. S., 14 Fed.Carr.Rep., par. 81,-303 (S.D.Ohio 1960) (Three-Judge Court).[3]

The Commission's view of the relationship between the second proviso and section 5(2) of the Act was set out in Buckeye Express, Inc.—Operations under Second Proviso of Section 206(a) (1), 76 M.C.C. 493, 496–497 (1958), affirmed sub nom. Buckeye Express, Inc. v. U. S., supra:

"We believe that the second proviso cannot be considered by itself but that it must be construed in the light of other pertinent provisions of the act, particularly section 5(4). All provisions of the act must be read together in order to give effect to the intent of the act as a whole. Section 206(a) (1) states a general rule of conduct, prohibiting any common carrier by motor vehicle from operating in interstate or foreign commerce unless and until such carrier obtains a certificate of public convenience and necessity from this Commission. The second proviso contains an exception to that general rule, and being an exception, it must be strictly construed. In numerous cases it has been found that the benefits of the second proviso are applicable only to those who fall strictly within its terms, and then only so long as they remain within its terms. To meet the terms of the second proviso, there must be a concurrence of three factors to make the proviso effective and to keep it effective; namely, (1) that the common carrier must be lawfully engaged in operating solely within a single State; (2) that there must be a board in such State having the power to grant or approve certificates of public convenience and necessity authorizing intrastate operations; and (3) that the carrier must have obtained such a certificate from such board. If all these factors do not coexist in the case of the carrier, the benefits of the proviso are not open to it. [Citations omitted.]

"Buckeye has satisfied the second and third of these requirements, and the only question is whether it is lawfully engaged in operating solely within a single State. The burden of proof rests on it to show that it is so operating, and that it is not commonly operated, managed, or con-

---

2. Investigation under section 5(7), and injunctive proceeding under section 5(8) or criminal proceeding under section 10.

3. This view of the statute should dispose of a possible attack on the Commission position, not advanced by plaintiffs. Since section 5(4) relates to control of two or more "carriers" and carriers are those defined in subsection (13) as subject to

Chapter 8, it might be argued that for the Collins control to be unlawful under section 5(4), Trucking would have had to reach second proviso status before the control commenced. However, since the Commission found that "the interstate operations of Trucking were unlawful in their inception," it must have held that Trucking never reached second proviso status.

trolled in a common interest within an operation conducted in more than one State. In determining this question, we are warranted in disregarding coporate [sic] forms and viewing the substance of the situation in order to prevent defeat of the regulatory purposes of the act. If a person is in a position to control the operations of both a single-State carrier and a multiple-State carrier, the former cannot be said to be operating within a single State for purposes of the second proviso, since its operations are not independent of those of the latter, or commonly controlled, carrier, and the fact that this power of control has not actually been exercised does not alter the situation."

In affirming, the Court said:

"[W]here * * * a person * * is in position to control the operations of both * * * a single-State carrier and * * * a multiple-State carrier, the former * * cannot be said to be operating within a single State for the purpose of the second proviso, since its operations are not independent of those of the latter * * *" (14 Fed.Carr.Rep. at 50,049).

We hold that it was a proper application of the statute for the Commission to consider prior illegal control in a section 5(2) proceeding.

Plaintiffs make three arguments with reference to the proceedings before the Commission and the Commission decision:

1. The Commission erred in finding that Everett Collins controlled Trucking;

2. Even if the Commission was correct in finding no second proviso status in Trucking, it should have decided the PCN application on the merits;

3. Two aspects of the hearing procedure violated the plaintiffs' constitutional rights.

1. Plaintiffs argue in their opening brief that assuming, *arguendo*, that Collins controlled Trucking, such control should not bear on plaintiffs' purchase application, because it began after the second proviso rights of Trucking came into existence and ended "by the time that Hart Motor Express and George Hart filed their section 5 application and assumed control of * * * Trucking." If there was control, it would not have ended *until* Hart took over temporary control of Trucking. The significance of this need not be developed, because if Collins was in control at any time, he was in control when Trucking began to operate under its purportedly legitimate second proviso authority.

Analysis of this question requires a brief summary of Trucking's corporate ancestry. Trucking was created in 1957 by Fargo Freight Terminal and Warehouse, Inc. (Terminal). Terminal had carried out carrier operations in North Dakota since 1951 under North Dakota Certificate No. 235, and a BMC–75 statement was on file with the Interstate Commerce Commission in Terminal's name. In 1957 Trucking was organized, and it carried on the former Terminal carrier operations. In January of 1958, Trucking filed its own BMC–75 statement with the Commission.

It is the Commission's position, challenged by the plaintiffs, that Trucking's second proviso status was void from the beginning because of the Collins control. The significance of the BMC–75 statement is important at this point. The plaintiffs argue that second proviso rights vest automatically "if three conditions are present:"

(1) The carrier operates solely within one state.

(2) That state has a board (the North Dakota Public Service Commission in this case) having authority under state law to grant certificates of public convenience and necessity.

(3) The state board has in fact issued such a certificate to the carrier.

Plaintiffs assume at least part of their conclusion by omitting the lawful operation aspect of the first condition, but accepting the plaintiffs' conditions, it is necessary to note carefully the Commission's position. The Commission regulation [4] requiring the filing of a BMC–75 statement is, according to the argument, based on the need to ascertain whether the carrier possesses the necessary State certificate and whether the carrier was under common control with a multi-state motor carrier. Presumably, if the carrier meets the second proviso conditions, the authority would automatically issue.[5]

■■ This use of the BMC–75 to insure that a carrier is entitled to second proviso authority is within the Commission's power. The second proviso itself states that "Such transportation shall, however, be otherwise subject to the jurisdiction of the Commission under this chapter." The proviso means only that once a State has determined that operations of a carrier serve the public convenience and necessity, a carrier cannot be required to obtain an Interstate Commerce Commission certificate of public convenience and necessity in order to carry on interstate transportation within the State. Navajo Freight Lines, Inc. v. U. S., 186 F.Supp. 377, 380 (D.C.Colo. 1960) (Three Judge Court); Gulf Coast Motor Freight Lines v. U. S., 35 F.Supp. 136, 137 (S.D.Tex.1940) (Three Judge Court). There is nothing in the wording of the statute which requires the conclusion plaintiffs draw that the second proviso rights vest by the statute; rather, it seems the better construction to view a Commission determination that the conditions have been met as a prerequisite to second proviso authority.

■ Were this Court to determine that second proviso authority began before the BMC–75 statement was filed, the plaintiffs still would not prevail if the

Commission's decision on illegal control were affirmed. Illegal control beginning almost simultaneously with the formation of the carrier and extending up to the point of sale to the carrier seeking section 5(2) authorization must surely mean that the purported second proviso carrier was not "lawfully engaged in operation," and, thus, is disqualified from carrier status.

■ We come to the Commission's decision on the control by Everett Collins. Our scope of review on this question is limited by the substantial evidence test. Gilbertville Trucking Co. v. United States, 371 U.S. 115, 126, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Administrative Procedure Act, § 10, 5 U.S.C. § 1009. Substantial evidence "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." N.L.R.B. v. Columbian Enameling and Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

Ray Kern, who was president of Terminal, formed Trucking early in 1957. Everett Collins, the owner of Collins Truck Line, Inc., an interstate motor carrier operating principally between St. Paul and Fargo, became interested in the purchase of Trucking. Collins apparently then negotiated with Kern. There is some dispute as to whether Collins ever negotiated without Thomas J. Frazier being present; the Commission found that he did and this finding is supported by the record. (R. p. 47; pp. 476–477). Frazier was a veteran motor carrier manager and owner. In March of 1957 he sold his 50% interest in a motor carrier and became a full time employee of Collins for about a six month period starting in May or June of 1957 and ending in September or October.

In June of 1957 Frazier and Kern came to an agreement whereby Frazier was to

4. 49 C.F.R. 210.10.

5. The Commission has rejected a BMC–75 statement on the grounds that the carrier-applicant was under common control with a multi-state carrier. Buckeye Express, Inc.—Operations Under Second Proviso of Section 206(a) (1), 76 M.C.C. 493 (1958), affirmed sub nom. Buckeye Express, Inc. v. United States, 14 Fed.Carr. Cas. par. 81,303 (S.D.Ohio, 1960). (Three Judge Court).

purchase Trucking for $35,000, but the contract was not consummated until November 30, 1957. The plans for operating Trucking were discussed by Frazier and Collins during this period. (R. pp. 118–120). One plan was that Collins would move to Fargo and manage Trucking, while Frazier would remain in Minneapolis managing the Collins line (R. pp. 118–119), and this plan was obviously given serious consideration, since Collins rented a house in Fargo in August of 1957, paying one month's rent in advance. (R. p. 460). Apparently during this period the negotiations for the rental of the building which Trucking was partially to occupy were carried on. The building was owned by Kern, and he and Collins negotiated the rental agreement (R. pp. 474–475).

The financial mechanics involved in the purchase of the Trucking stock by Frazier were considered important by the Commission. [6] The purchase price was $35,000. $20,000 was paid in cash, with the remaining $15,000 payable in three equal installments. Of the $20,000, $5,000 was allocated for Kern's covenant not to compete. On June 6, 1957, Frazier gave Kern a cashier's check for $4,400, the source of which is unexplained. Collins made Frazier a $5,000 loan which went to Kern, as did Frazier's personal check for $3,756. The amount remaining necessary to make up the $15,000 cash down payment for the stock, approximately $1,843, was loaned to Frazier by Collins and paid to Kern on November 30, 1957. (R. pp. 101–103; 155–156). The record contains no mention of the source of the $5,000 payment for the covenant. The Collins-Frazier loans were secured by a pledge of the Trucking stock and an option. (R. p. 156; Exhibit 8). The option gave Collins or Collins' nominee the opportunity to purchase all the capital stock of Trucking at a formula set out in the option. Frazier promised not to encumber the stock and not to issue any more than the 200 shares of stock which was the total amount outstanding in November of 1957.

We next consider the role played by Collins in the operation and management of Trucking. Soon after the November 30, 1957 transaction Frazier became a full time employee of a Minneapolis barge line. He was nominally Trucking's president and received a $50 per month salary from Trucking.

The operating manager of Trucking was Ray Gruel. Gruel was hired by "a combination of Tom Frazier, Ray Kern and Everett Collins," according to Gruel (R. p. 47), although the actual offer was made by Kern and Collins (R. p. 52), and the original decision to hire Gruel was made by Kern and Collins (R. p. 476). The amount of Gruel's compensation was left open and he made withdrawals from time to time with the advice of Everett Collins (R. pp. 53–54).

The record indicates a pattern of Collins' participation in the management of Trucking. He was present when a bookkeeping system for Trucking was established (R. p. 63); he accompanied Kern and the driver to the union hall when certain of his equipment was damaged (R. pp. 475–476); he discussed management matters with Gruel (R. p. 485).

The significance of these activities and others referred to in the Commission opinion is emphasized when they are contrasted with Frazier's lack of participation in Trucking management. The keynote of the situation was sounded by Ray Gruel in the following testimony:

"Q. Well, did you have to make any decision in the management of the company which you felt should be made by your superiors in the company, the officers of the company, or anybody in control of the company?

---

6. Supplying funds to allegedly independent third party purchasers is a type of informal practice the Supreme Court has cited as covered by section 5(4) of the Act, and, thus, requiring prior approval under section 5(2). Gilbertville Trucking Co. v. United States, 371 U.S. 115, 125–126, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962).

"A. I would say that the day to day operation was—the decisions were made by myself, but if anything on the unusual nature occurred, I would contact Mr. Collins." (R. p. 493).

If, as plaintiffs argue, Frazier was an "absentee landlord," would it not be logical to assume that Frazier, the president and owner of the company and an experienced hand in the motor carrier field, would be the person Gruel would get in touch with in the event of something unusual?

The record does not disclose that Frazier was familiar with any aspect of Trucking's operations except for some equipment purchases. He had no knowledge of the general leasing arrangements of Trucking (R. p. 124) or of the lease arrangements with the Collins line (R. p. 129). He did not know how many pieces of equipment would pass to Hart if the Hart sale were approved (R. p. 130) nor had he any grasp of the financial arrangements relative to the amount due Kern on the original stock purchase (R. p. 134).

■ The evidence provides ample support for the Commission's conclusion that "Collins was the guiding and moving force behind" Trucking. While an actual participation in the management of the controlled carrier is not necessary under the Act,[7] there is much evidence of such participation in addition to financial control which itself showed a power to exercise control.

2. The plaintiffs argue that even if the Commission was correct in finding no second proviso status in Trucking, it should have decided the PCN application on the merits.

■ This issue may not be properly before this Court, since it was not raised in plaintiffs' petition for reconsideration by the Commission. It is a sound principle of administrative law that an administrative agency should not be reversed unless it has had whatever opportunity is appropriate under its procedure to correct its alleged error, United States v. L. A. Tucker Truck Lines, Inc., 344 U. S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), and this principle has been applied in I.C.C. cases where parties attempt to raise issues in review proceedings not raised in the petition for reconsideration. See Nowinsky Trucking Co. v. United States, 195 F.Supp. 748, 751 (W.D.Wis.1961) (Three Judge Court); Gateway Transportation Co. v. United States, 173 F. Supp. 822, 828 (W.D.Wis.1959) (Three Judge Court).

■ If the issue is properly before us, we think that the Commission was correct in dismissing the PCN application. It is plaintiffs' contention that section 207 (a) of the Act (49 U.S.C. § 307(a)) does not allow the Commission to dismiss an application for a certificate of public convenience and necessity, but that the Commission must either grant or deny the application. The Commission, after stating its finding that the purchase application did not present a transaction within the scope of section 5(2) of the Act, said that "the application and the related application under section 207 [the PCN application] should be dismissed." This decision was made by division 3 of the Commission. Division 1 of the Commission has the responsibility for determining applications under section 207 of the Act. Organization Minutes of I.C.C., 26 F.R. 4773 (May 30, 1961). Division 3 can only consider section 207 applications which are "directly related" to section 5(2) applications for purchases, consolidations, etc., ibid. Therefore, the Commission decision to dismiss the PCN application resulted from its decision that it had no jurisdiction to consider the Purchase application. Without a section 5 (2) application to decide, division 3 would exceed its responsibility if it decided a section 207(a) application.

---

7. Section 5(4) provides that "[a]s used in this paragraph and paragraph (5) of this section, the words 'control or management' shall be construed *to include the power to exercise control or management.*" (Emphasis added.)

The statute should not be read to require the Commission to decide a section 207(a) application not properly before it. The Commission's position is consistent with long standing policy. In C & D Motor Delivery Co.—Purchase—Hubert C. Elliot, 38 M.C.C. 547 (1942) the Commission stated:

"In other words, unless there is jurisdiction to consider the matter under section 5, there is no 'directly related' matter to be considered by division 4 in connection with issuance of a certificate. If the transaction is not one within the scope of section 5, as found in the Baggett case, and the application is dismissed for lack of jurisdiction, there remains nothing for division 4 to consider. Any authority for the institution of new operations would clearly be a matter arising solely under section 207, there being no section 5 matter to which it could be related so as to permit of consideration by division 4. It was not the intent of the Commission that division 4 should handle matters arising under section 207 as an alternative division to division 5, which has been assigned such matters for handling; but only that division 4 should handle the issuance of certificates of public convenience and necessity when such matter arises in the section 5 proceeding and should be considered as inseparable from such proceeding." (At p. 552).

C & D Motor Delivery is "the leading decision establishing the procedure to be followed in a section 5 transaction whereby the acquiring carrier, operating in more than one State and therefore ineligible to claim the benefits of the proviso, may, as a matter directly related to the transaction, seek a certificate of public convenience and necessity to continue the operations theretofore conducted by the selling carrier under the proviso." McDuffee Motor Freight, Inc.—Control—Sutton Transfer, Inc., 75 M.C.C. 399, 405 (1958). The plaintiffs were themselves aware of this procedure for in their section 207 application they say that "this authority is requested to substitute for the registered rights if purchase is approved." The direct relationship between the applications is readily apparent; the plaintiffs conceded as much in their Petition for Reconsideration when they stated that "the two applications are not separable."

The plaintiffs have presented no reasons why we should overturn this long established Commission practice which appears to be a reasonable implementation of the statute, and we must reject the argument, in the circumstances of this case, that the statute compels a decision by division 3 on the plaintiffs' section 207(a) application.[8]

3. Procedural errors at the hearing.

Plaintiffs object to the Hearing Examiner's decision, affirmed by the Commission, to allow various protesting carriers to appear and participate in the Hearing. It is plaintiffs' contention that only Buckingham Freight Lines should have been allowed to appear because only Buckingham filed a timely written protest.

The Commission said that "rule 1.240(c) (2) [of the General Rules of Practice of the Commission] clearly permits the participation at the oral hearing of those protestants who failed seasonably to file protests." 90 M.C.C. at 531. The plaintiffs challenge the Commission's construction of the rule[9] and argue that

---

8. An extensive record has been compiled on the public convenience and necessity issue. If the present record could properly be presented to division 1 of the Commission, it would seem a great waste of effort and time to require a complete duplication of the Hearing and Examiner's Report.

9. Rule 1.240(c) (1):
"(c) *Protests and requests for hearing.*
"(1) Protests to the granting of an application shall be filed with the Commission within 30 days after the date notice of the filing of the application is published in the FEDERAL REGISTER. Any interested person filing a protest to an

if the rule has been correctly construed by the Commission, "it deprives the plaintiff of due process of law and is unconstitutional."

Their position is that the rule should not be construed so as to allow an applicant to be confronted with unexpected protestants. Faced with the clear language of section (c) (2) of the rule to the effect that failure seasonably to file a protest is a waiver of opposition and participation *unless an oral hearing is held,* plaintiffs say that what is meant is that a person may appear to protest an application for *temporary* authority without filing a protest. The Commission has not construed the rule in this way and as a matter of statutory construction the plaintiffs' position is difficult to accept. The first part of section (c) (1) sets out the procedure for protesting a section 5(2) application. The second part allows a person who so protests or who appears at a hearing in opposition to the section 5(2) application to participate also in proceedings upon an application for temporary authority. There are two classes of protestants described by the rule: those who file a protest and those who appear at a hearing. This reading is reinforced by section (c) (2). It is part of the scheme of certain proceedings before the Commission, including a section 5(2) application, that protesting carriers can appear without filing a Rule 1.72 petition for leave to intervene. Rule 1.73 (General Rules of Practice of the I.C.C.). See 1 Davis, Administrative Law Treatise § 8.11, p. 570 (1958).

Rule 1.240(c) (1) is hardly a model of clarity, but it is not the tortured creature plaintiffs make it out to be.

application under Section 5(2), or appearing at a hearing in opposition thereto, shall be entitled to participation in proceedings upon any application for temporary authority under Section 210a(b) filed in the same docket."

Rule 1.240(c) (2) provides:

"(2) Failure seasonably to file a protest will be construed as a waiver of opposition and participation in the proceeding unless an oral hearing is held."

Assuming that the rule was correctly applied, does such application deprive plaintiffs of Fifth Amendment rights?

Such a contention is a serious one, indeed, but plaintiffs fail to develop it beyond an assertion. The rules complained of were adopted by the Commission under the procedures of the Administrative Procedure Act [10] and were apparently applied to plaintiffs in the same manner as they have been applied to others. It is obvious that plaintiffs disapprove of the rule,[11] but they have not shown how they were deprived of property without the process due them.

Plaintiffs also claim that the issue of prior unlawful control was raised at the hearing without notice to them. That issue was properly before the Commission, supra, pp. 4–6, and it is a matter on which plaintiffs should have been prepared to assume their burden of proof; certainly they were on notice by the October hearing dates.

We have considered the arguments and briefs of counsel and all the files and records.

We conclude that plaintiffs are not entitled to judgment setting aside the Orders in MC–F–7399 and MC 78643 (Sub. 43) and remanding the matters therein to the Commission. We conclude further that plaintiffs are not entitled to a mandatory injunction directing the Commission to take jurisdiction of the subject matter of the two applications in question.

The Commission reached a permissible conclusion based on substantial evidence in the record, and its decision is not arbitrary or capricious.

The complaint of plaintiffs is dismissed.

10. Administrative Procedure Act, § 4, 5 U. S.C. § 1003; 21 Fed.Reg. 5749.

11. It is not altogether clear that plaintiffs were surprised by the protestants' appearance. They were told informally prior to the April hearing that the protestants would appear and to the extent that they were surprised, they had the period between April 25 and October 3, the date of the second hearing day, to recover. Much of the damaging testimony on the control point came out on October 3 and 4.