**NORTH ALABAMA EXPRESS, INC., et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 77–1341.

United States Court of Appeals, Fifth Circuit.

July 17, 1978.

---

Maurice F. Bishop, Birmingham, Ala., for petitioners.

Mark L. Evans, Gen. Counsel, I.C.C., Henri F. Rush, Associate Gen. Counsel, Griffin B. Bell, U.S. Atty. Gen., U.S. Dept. of Justice, John H. Shenefield, Acting Asst. Atty. Gen., R. Craig Lawrence, I.C.C., Barry Grossman, Chief, App. Section, Dept. of Justice, Catherine G. O'Sullivan, Atty., Christine Kohl, I.C.C., Washington, D.C., for respondents.

David G. Macdonald, Washington, D.C., Phineas Stevens, Rhesa Barksdale, Jackson, Miss., Harry J. Jordan, Kim D. Mann, Washington, D.C., for intervenors.

Before HILL, RUBIN and VANCE, Circuit Judges.

VANCE, Circuit Judge:

This case comes to us on petition for review of a final order of the Interstate Commerce Commission, Division 3, granting authority for transportation of interstate freight to four multistate carriers, under

Section 207 of the Interstate Commerce Act (the "Act"), 49 U.S.C. Section 307.

A–OK Motor Lines, Inc., an Alabama corporation organized in 1960 (A–OK), was a common carrier by motor vehicle authorized to transport freight, over regular and irregular routes,[1] within Alabama. A–OK was authorized to carry intrastate freight pursuant to certificates issued by the Alabama Public Service Commission ("APSC"), and interstate or foreign freight pursuant to certificates of registration issued by the Interstate Commerce Commission.

A–OK ceased operations on October 20, 1970 and was adjudged bankrupt on November 17, 1970. The trustee in bankruptcy determined that A–OK's most valuable asset was its operating authority. With the approval of the bankruptcy court of the Middle District of Alabama, the trustee solicited bids for the sale of such authority. The successful bidders were four interstate carriers.[2] The trustee entered into four separate but similar contracts with such carriers, each of which concerns the transfer of separate portions of A–OK's operating authority.[3] Each contract was conditioned upon approval of such transfers of A–OK's operating authority by the APSC and I.C.C.

Appropriate applications were filed with the APSC[4] and I.C.C. and the required notices were published.[5] The carriers also filed applications with the I.C.C. for temporary operating authority under Section 210a(6) of the Act, 49 U.S.C. § 310a(6). The intrastate authority remained inactive since Alabama had no provision for temporary authority.

To aid understanding of the developments concerning such applications and our resolution of the issues now presented it is appropriate that we digress at this point for a consideration of the controlling sections of the Interstate Commerce Act.

## Controlling Statutory Provisions

Section 206(a)(1) of the Act, 49 U.S.C. § 306(a)(1), forbids a common carrier by motor vehicle to engage in interstate commerce unless it shall have obtained and has in force a certificate of public convenience and necessity ("PCN") issued by the commission.

---

1. As used here, "regular route" authority means the authority to carry goods in a scheduled operation over a restricted and defined route; "irregular route" authority means the authority to carry goods in an unscheduled operation within a restricted territory but wholly unrestricted as to route.

2. Reliable Truck Lines, Inc. (Reliable); Cooper Transfer Co., Inc. (Cooper); Gordon's Transports, Inc. (Gordon); The Mason & Dixon Lines, Inc. (M&D).

3. Proposed transfers of authority:
   (a) Reliable—between Birmingham, Alabama and points within 15 miles thereof, on the one hand, and 2 named cities and towns, on the other.
   (b) Cooper—between Birmingham, Alabama and points within 15 miles thereof, on the one hand, and 38 named cities and towns, on the other.
   (c) Gordon—between Birmingham, Alabama and points within 15 miles thereof, on the one hand, and 15 named cities and towns, on the other.
   (d) M&D—between Birmingham, Alabama and points within 15 miles thereof and Mobile, Alabama, via U.S. Highway 31, serving intermediate points.

4. Under Title 48 § 301(15) of the *1958 Recompiled Code of Alabama*.

5. 49 CFR § 1100.240 requires that notice in the Federal Register be given of applications under § 5(2) (for transfer of A–OK's authority) and § 210a(6) (for temporary operating authority). Separate notices were published for each individual bidder (Federal Registers: April 14, 1971, pgs. 7088–89; April 21, 1971, pgs. 7562–63; April 28, 1971, pg. 8015), with each giving notice of the applicant's seeking authority to purchase "a portion of the operating rights of A–OK" and describing the "operating rights sought to be transferred." Federal Register notice of a "directly related" section 207 application was also given by each of the carriers (Federal Registers: June 23, 1971, pg. 11966; July 8, 1971, pg. 12881; Aug. 4, 1971, pg. 14366; Aug. 25, 1971, pg. 16720).
The notices read in part that, "[A]uthority sought herein corresponds to the authority set forth in certificates of registration applicant is purchasing from Sammuel Kaufman, Trustee in Bankruptcy for A–OK Motor Lines, Inc., *in a directly related finance proceeding* pending before the Commission . . . published in the Federal Register . . . ." (Emphasis supplied).

682

Section 207 specifies the findings on the basis of which such a certificate is issued. An application for such certificate may be either "related," *i. e.*, in conjunction with another application; or it may be "unrelated," *i. e.*, by itself and not in conjunction with another such application.

■■■ To support an "unrelated" section 207 application the applicant has the burden of demonstrating that present or future public convenience and necessity will be served by the applicant's proposed new operation. *Curtis, Inc. v. United States*, 225 F.Supp. 894 (D.Colo.1964). In making such determination the commission looks to the adequacy of the existing facilities to meet present or future transportation requirements, the desirability of competition, different kinds of service and of improved service. *Lemmon Transport Co. v. United States*, 393 F.Supp. 838 (W.D.Va.1975).[6] An "unrelated" section 207 PCN certificate is issued, following application, proper notice and public hearings, by Division 1, the "Operating Rights Division," of the commission. *Organization Minutes of I.C.C.*, 26 F.R. 4773 (May 30, 1961).

■■■ A carrier such as A–OK, which operates within a single state (and is not involved in a control relationship with an interstate carrier) may qualify to carry interstate freight within the same scope as its intrastate operations without a section 207 PCN certificate if it meets the requirements for a "certificate of registration" under either of two special provisions. The one applicable to the A–OK situation is a "grandfather" provision found in section 206(a)(7)(A), 49 U.S.C. § 306(a)(7)(A).[7] Interstate operations under a "certificate of registration" are regarded as incident to the carrier's intrastate operation. This section provides that "certificates of registration shall be valid only so long as the holder is a carrier engaged in operation solely within a single State . . . ."

Section 5, 49 U.S.C. § 5, makes lawful various mergers, unifications and acquisitions with the approval and authorization of the commission and prescribes certain procedures in connection with such transactions. Division 3 has the authority to hear section 5 applications relating to "acquisitions of control of carriers" and to hear section 207 applications that are "directly related" to a section 5 acquisition. *Organization Minutes of I.C.C., supra.* The applications now before the court were heard and decided by Division 3 as "directly related" to section 5 applications of the purchasing carriers.

*Actions on the Applications*

On October 30, 1972, the APSC issued an order denying the intrastate applications. An appeal was taken to the Circuit Court of Covington County, Alabama, which reversed the APSC.

On January 19, 1973 the Administrative Law Judge (the "ALJ") recommended approval of the section 5 and directly related section 207 applications *conditioned* upon surrender and cancellation of A–OK's certificates of registration and *upon approval*

---

**6.** In *Pan American Bus Lines Operation*, 1 M.C.C. 190, 203 (1936) the commission summarized the question which must be resolved in each case as a factual determination of

[W]hether the new operation or service will serve a useful public purpose, [be] responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by [the] applicant with the new operation or service proposed without endangering or impairing the operation of existing carriers contrary to the public interest.

**7.** Certificates of registration are issued either by Division 1 (where hearings are held or evidence is submitted by affidavit) or by the Oper-

ating Rights Board No. 1 (where no hearing is held or evidence submitted by opposing parties in the form of affidavits). *Organization Minutes of I.C.C., supra.* In general the requirement for a certificate of registration under this subsection involves a showing by the carrier that on October 15, 1962 it was in operation solely within a single state as a common carrier by motor vehicle in intrastate commerce and was also lawfully engaged in such operations in interstate commerce under the exemption provisions theretofore in effect. The other special provision is found in § 206(a)(6) and governs situations where the single state carrier was not in operation in interstate commerce on October 15, 1962.

*of the transfer of the intrastate certificate by APSC* (which had been a condition in the contracts with the trustee and of the original applications). On December 13, 1973 Division 3 upheld the finding of the ALJ and denied the purchasing carriers' request that the commission modify the ALJ's order to allow sale of A–OK's interstate authority prior to the final Alabama state court decision on A–OK's intrastate authority. In denying the request Division 3 cited section 206(a)(7)(A) for the prohibition against the certificate of registration being transferred "apart from the transfer of the corresponding intrastate certificate . . . ."

On May 30, 1974 Division 3 denied the purchasing carriers permission to amend the sales contracts to provide for the sale of the interstate operating rights, embodied in the certificates of registration (by way of issuing section 207 certificates) without the sale of the corresponding intrastate authority stating in part:

> [T]his Commission has consistently refused to sanction sale of rights embodied in a certificate of registration when the purchaser would not also acquire the corresponding intrastate authority, see *Cook Motor Lines, Inc.—Purchase (Portion)— Epperly Motor Freight, Inc.*, 116 M.C.C. 300 (1972), and hence the petitions must be denied in this respect.

On June 16, 1975 Division 3 denied the carriers' second petition for reconsideration, again holding that a certificate of registration could not be sold apart from the underlying intrastate rights.

Thereafter, on December 18, 1975, the Alabama Supreme Court reversed the lower court and unanimously upheld the ruling of the APSC denying the transfer of A–OK's intrastate authority. Rehearing was denied. In response to the Alabama Supreme Court's decision, the Circuit Court of Covington County, Alabama entered an order affirming the APSC and the Alabama litigation was final.

Following the Alabama Supreme Court's decision, the purchasing carriers filed their third petition for reconsideration with the commission. They proposed to surrender and cancel A–OK's certificates of registration; and to have Division 3 issue section 207 PCN certificates based on the evidence and testimony adduced at the original hearing on the section 5 and section 207 "directly related" applications.

On August 12, 1976 Division 3 reversed its prior action, granted the amended applications and, conditioned only upon *cancellation* by APSC of A–OK's intrastate operating authority, approved the proposed "transfer" of its interstate authority. That action prompted the present petition for judicial review by competitors who were protestants before the I.C.C.

### Transfers Which Are Not Transfers

Since 206(a)(7)(A) clearly precludes the transfer of certificates of registration from carriers engaged in operation solely within one state (such as A–OK) to carriers engaged in more than one state, the uninitiated might well inquire at this point as to how the proposed transfers to Reliable, Cooper, Gordon and M&D would be possible in any event. The answer is found in a rather complicated administrative approach that developed over thirty years ago. See, *e. g.*, *The C & D Motor Delivery Co.-Purchase-Elliott*, 38 M.C.C. 547, 553 (1942). Carriers such as the purchasing carriers here have been allowed in effect to accomplish the transfer of interstate operating rights under a certificate of registration from a single state carrier by filing a section 5 application for approval of the acquisition transaction and a "directly related" section 207 application. These are the applications which in this instance were filed by the purchasing carriers. The section 207 application is necessary to satisfy the requirement of section 206(a)(1), *i. e.*, an interstate carrier may only operate in interstate commerce by the authority granted under a PCN certificate. Because the certificate of registration cannot be transferred to an interstate carrier, such carrier must obtain its own interstate authority by way of a "directly related" PCN certificate. Whether or not the procedure is correctly referred to as a transfer, interstate carriers thus

have been allowed in practical effect to acquire the interstate authority that was previously held by the single state carrier under the certificate of registration.

Under the so-called Elliott Doctrine[8] such a "directly related" section 207 application may be supported by the intrastate carrier's past record to demonstrate that the present or future public convenience and necessity will be served by authorizing the interstate carrier to operate the routes. Thus the burden on the applying transferee is made significantly less difficult and his chances of success in obtaining interstate authority are enhanced.

It is understandable that in most respects such procedures are treated by the commission as transfers. The record before us reflects that in the present case they were so treated. A condition contained in section 206(a)(7)(A) provides that rights covered by certificates of registration:

> may not be transferred apart from the transfer of the corresponding intrastate certificate.

And the succeeding provision states:

> The termination, restriction in scope, or suspension of the intrastate certificate shall on the 180th day thereafter terminate or similarly restrict the right to engage in interstate or foreign commerce unless the intrastate certificate shall have been renewed, reissued or reinstated or the restrictions removed within said one hundred eighty-day period.

These provisions were intended by Congress to control permitted transfers from one single state carrier to another single state carrier. Until its order of August 12, 1976, however, Division 3 and the ALJ treated them as if they controlled the present case.

We are aware that approval has been given by at least one three judge district court to the certificate of registration "transfer" device which has evolved within

the commission; *Navajo Freight Lines, Inc. v. United States*, 263 F.Supp. 438 (C.D.Cal. 1967); and are also aware of the contention that Congress has acquiesced in such practice. Distribution of regulatory authority in this overlapping area between state and federal regulatory agencies, however, is the studied product of congressional compromise. We should carefully examine transgressions of the imposed limits whether in substance or form.

The usual situation in which certificate of registration rights are being "transferred" to an interstate carrier involves some independent basis of Division 3's authority. The PCN application designed to work the "transfer" usually is closely related to something: either an application for section 5 approval of a corporate merger or other acquisition, an agreement to purchase assets, and almost invariably (as was originally true here) acquisition of the underlying intrastate rights. In the present case, however, at the time of Division 3's last ruling on August 12, 1976 the purchasing carriers' applications covering A–OK's certificate of registration rights had been stripped of all connection with any other application. They were "directly related" to nothing.

### The Issues Before The Court

██ On review petitioners first challenge Division 3's authority to grant the purchasing carriers' applications on the basis of the "cancellation" rather than the "transfer" of A–OK's intrastate certificate. The commission and the purchasing carriers, who now appear as intervenors, answer that cancellation of A–OK's certificate avoided the evil Congress sought to prevent when it adopted the 1972 amendments which now appear in section 206(a)(7)(A) and section 206(a)(6), and that under a proper interpretation of those provisions Division 3's action complied with their requirements.[9] In presenting

---

**8.** See *The C & D Motor Delivery Co.-Purchase-Elliott, supra.*

**9.** The incongruity of the commission's position is underlined by reference to the history of the 1962 amendments to the Act. The legislation

was designed to correct recognized abuses involving the obtaining and transfer of interstate rights by the registration of intrastate certificates. Perhaps the problem might have been approached so as to permit the result for which the commission now contends. Neither the

their respective contentions all parties thus approach the matter as if it were governed by the same rules applicable to permitted transfers from one single state carrier to another. Practices which are familiar are merely assumed to be legally permissible.

As an alternative or "fall back" position the commission and particularly the purchasing carriers contend that because the evidence overwhelmingly met the purchasing carriers' public convenience and necessity burden, Division 3 properly granted their applications wholly aside from the A–OK "transfer" as "unrelated" applications. Petitioners respond that Division 3 lacks such authority, particularly after the applications were noticed and heard as "directly related" to and conditioned on the A–OK "transfer." This brings us to what we consider to be the controlling issue: Does Division 3 have authority to effect a transfer of interstate rights under a registration certificate from a single state carrier to a multistate carrier in a proceeding which is not related to anything else?

Until the August 12, 1976 action by the commission these applications were treated by the parties, the ALJ and by Division 3 as involving sales and transfers of both interstate and intrastate operating authority.[10] The condition requiring transfer of the corresponding intrastate certificate in 206(a)(7)(A) was treated as being applicable.

■ The Supreme Court of Alabama effectively closed the door on applicants' meeting the 206(a)(7)(A) condition. The only substantial matter left before Division 3 was the proposed sale and transfer of the authority previously held by A–OK to transport interstate freight under a certificate of registration. The nature of that authority was described in *Southern Pacific Transport Co. of Texas v. United States*, 369 F.Supp. 927 (N.D.Tex.1972) as:

> incident to the carrier's intrastate operation and the interstate authority, even after being granted cannot exist in the absence of the corresponding intrastate authority.

commission nor the Congress was then under the impression, however, that it was doing so.

In response to a request from the chairman of the House Committee on Interstate and Foreign Commerce for comments on the proposed measure, the commission's representative described its effect in a transfer situation by stating:

> In addition, any subsequent termination of or restriction in the scope of the intrastate certificate would similarly restrict the interstate rights. U.S.Code *Congressional and Administrative News*, 1962, Vol. 2, p. 3169.

Conference Report 2439, U.S.Code Cong. & Admin.News 1962, p. 3171 reflects that the Senate conferees refused to accept two House amendments which would have altered the automatic termination of interstate authority under a certificate of registration 180 days after termination of the underlying state authority. As a consequence the amendments were deleted in conference and do not appear in the legislation as adopted. The intent of Congress is manifest. Interstate authority under a certificate of registration cannot survive—and not surviving cannot be "transferred"—after elimination of the corresponding intrastate authority.

In *All-American Transport, Inc.-Control and Merger-Pals Transfer, Inc.*, 109 M.C.C. 243, 249 (1969) the commission itself held:

> Registration authorities are granted on the basis of an underlying State certificate, and absent the State authority there is no basis

for interstate authority. Congress recognized that a certificate of registration would be automatically voided if the intrastate certificate were revoked, by adopting the 180-day grace period. The statutory 180-day grace period was recognition that, but for the grace provision, a carrier would have no opportunity to reestablish its state certificate and thereby prevent the revocation of the interstate certificate of registration. Moreover, where the intrastate right is transferred apart from the certificate of registration, the certificate would be destroyed again because *the carrier has no interstate certificate without the possession of an intrastate certificate.* (Emphasis supplied.)

And in *Daniels v. United States*, 210 F.Supp. 942, 951 (D.Mont.1962), *aff'd* 372 U.S. 704, 83 S.Ct. 1018, 10 L.Ed.2d 124 (1963), another three judge district court stated:

> Under Section 206(a)(1) both prior to amendment and after amendment, intrastate rights and an intrastate certificate form the basis of acquisition of interstate rights within the state. No grant of interstate rights is contemplated to a carrier who has no corresponding intrastate rights.

10. Aside from operating authority, an insignificant amount of other property was involved in one of the applications.

No unification, merger or acquisition of control was involved. The applications of the purchasing carriers involved nothing more or less at this point than their proposed purchase and acquisition of A–OK's interstate authority under its certificate of registration—authority which cannot continue to exist independent of the underlying intrastate authority. A naked transfer of that authority to interstate carriers is simply not permitted under the statute. Further pursuit by the purchasing carriers of the interstate authority sought should have been by way of an "unrelated" section 207 application before Division 1 of the commission.

■ Division 3 exceeded its authority when it reversed its prior rulings and approved the purchasing carriers' newly transmuted and "unrelated" section 207 applications. Division 3 lacks authority to decide section 207 applications where they are not "directly related" to a section 5 transfer application. In *Hart v. I.C.C.*, 226 F.Supp. 635, 643 (D.Minn.1964) the court held:

> The commission, after stating its finding that the purchase application did not present a transaction within the scope of Sec. 5(2) of the Act, said that "the application and the related application under Sec. 207 [the PCN application] should be dismissed." This decision was made by division 3 of the Commission. Division 1 of the Commission has the responsibility for determining applications under Sec. 207 of the Act. Organization Minutes of I.C.C., 26 F.R. 4773 (May 30, 1961). Division 3 can only consider Sec. 207 applications which are "directly related" to Sec. 5(2) applications for purchases, consolidations, etc. *ibid.* Therefore the Commission decision to dismiss the PCN application resulted from its decision that it had no jurisdiction to consider the purchase application. Without a Sec. 5(2) application to decide division 3 would exceed its responsibility if it decided a Sec. 207(a) application.

The correctness of the *Hart* holding is supported by *Best Way Motor Freight, Inc. v. United States*, 253 F.Supp. 314 (W.D.Wash. 1966) and rulings of the commission itself. See, *e. g., The C & D Motor Delivery Co.-Purchase-Elliott, supra; All-American Transport, Inc.-Control and Merger-Pals Transfer, Inc., supra.*

We do not reach the questions concerning the sufficiency of notice and whether the evidence is sufficient to support an "unrelated" application if the testimony taken under the Elliott Doctrine were eliminated. Our decision makes such further inquiry inappropriate. On their face, however, the procedures of Division 3, including its hindsight weighing of the evidence and its mutation of issues from those noticed, unnecessarily present problems of serious magnitude.

Here, four multistate carriers seek the right to transport interstate freight over routes formerly authorized to a single state carrier. What began as a "transfer" from one bankrupt intrastate carrier emerged over five years later as four separate authorities held by four interstate carriers. This may give some insight into the following characterization by the APSC:

> The record establishes, and we so find, that when the proposed division of this authority is considered in conjunction with the authorities presently held by the applicants, and the tacking [11] that would be possible . . . we are not being asked to approve the revival of the A–OK's rights but to approve a major readjustment of the transportation industry of Alabama. *Alabama Public Service Comm. v. Cooper Transfer Co.*, 295 Ala. 209, 326 So.2d 283, 286 (1975).

The matter is obviously of substantial importance. It has now extended over an inordinate number of years and should be brought to a conclusion. On the record before us, however, we are not free to effect such a result without compromising

---

11. Tacking is operation by a carrier between two or more of its regular routes or between irregular and regular routes in order to reach a point which could not legally be served by operation over any single irregular or regular route or combination of regular routes. It is a joinder of separate grants of authority at a point common to both.

the congressional purpose as expressed in the Act and the integrity of the commission's own processes.

Division 3's order now under review is due to be vacated and set aside and the case remanded to the Interstate Commerce Commission for dismissal by that division. Such action is without prejudice to consideration of appropriate PCN applications by Division 1 of the commission.

ORDER SET ASIDE AND CASE REMANDED.