**NAVAJO FREIGHT LINES, INC., Oregon Nevada California Fast Freight, Inc., Southern California Freight Lines, Ltd., and Western Gillette, Inc., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**WESTERN GILLETTE, INC., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Nos. 65494–65555.

United States District Court
C. D. California.
Jan. 17, 1967.

Russell & Schureman, Los Angeles, Cal., for plaintiff.

W. D. Benson, Jr., Lubbock, Tex., Arthur H. Glanz and William F. Clements, Los Angeles, Cal., for defendants by intervention.

Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger, Atty. Dept of Justice, Washington, D. C., John K. Van de Kamp, U. S. Atty., Los Angeles, Cal., for the United States.

Robert W. Ginnane, Gen. Counsel, and Robert S. Burk, Washington, D. C., for Interstate Commerce Commission.

Before BARNES, Circuit Judge, BYRNE and CROCKER, District Judges.

BYRNE, District Judge.

These are actions to enjoin, annul, and set aside orders of the Interstate Commerce Commission. Jurisdiction and venue in each case rest upon 28 U.S.C.A. §§ 1336, 1398, 2284 and 2321–2325. By stipulation of the parties, the actions were consolidated for trial.

No. 65–494

The controversy herein relates to the Commission's interpretation of various provisions of the Interstate Commerce Act in connection with a proposed merger of Constructors Transport Co. of Montebello, California, into T.I.M.E. Freight Inc. of Lubbock, Texas.

Constructors, prior to the merger, was a trucking firm operating solely within the State of California. It conducted intrastate operations under authority of two intrastate certificates issued by the California Public Utilities Commission. It also handled interstate shipments over its California routes by means of a statutory exemption in the Interstate Commerce Act in force until October 15, 1962, which provided that a single-state carrier need not have a certificate of public convenience and necessity if its intrastate operations had been duly authorized by the requisite state agency. Constructors also held a certificate from the I.C.C. authorizing certain interstate operations, but this was found to be dormant by the I.C.C. and was cancelled as part of the merger transaction.

T.I.M.E. was, and still is, a large multi-state trucking firm doing business throughout most of the United States. All of its interstate operations are conducted by means of certificates of public convenience and necessity issued by the I.C.C.

By an agreement entered into in 1962, T.I.M.E. sought to acquire control of Constructors and to merge Constructors' operations into its own. The acquisition was to be financed by a new issue of shares of stock in T.I.M.E. which would be transferred to the owners of Constructors in return for the assets of Constructors. As part of the agreement, certain obligations of Constructors were to be assumed by T.I.M.E. Since T.I.M.E. is a multi-state carrier, and Constructors' interstate operations were being conducted under an exemption applicable only to single-state carriers, the merger agreement was conditioned upon T.I.M.E. receiving a certificate of public convenience and necessity which would permit it to continue to carry the interstate traffic of Constructors.

Pursuant to the merger agreement, four separate applications were filed with the Interstate Commerce Commission on October 11, 1962. The first of these applications sought approval of the proposed merger under 49 U.S.C.A. § 5. Pending that approval, temporary authority to permit T.I.M.E. to operate Constructors was sought under 49 U.S. C.A. § 310a(b). Approval of the financing of this transaction by means of stock issuance and assumption of obligations was sought under 49 U.S.C.A. § 314 and § 20a. Finally, T.I.M.E. sought the aforementioned certificate of public convenience and necessity under 49 U.S.C.A. § 307 to enable it to transport interstate traffic over the California routes of Constructors.

Four days later on October 15, 1962, certain amendments to the Interstate Commerce Act became effective. Much of the dispute in this case centers on the effect, if any, of these changes on the proposed merger. The substance of these changes provided that single-state carriers now need a certificate of registration from the I.C.C. to conduct interstate business. This certificate issues upon a showing of a state agency determination that the proposed interstate service is necessary and convenient or under the "grandfather" provisions upon a showing of past operations under the old exemption for single-state carriers. Constructors applied for a certificate of registration under the "grandfather" provision.

On October 26, 1962, the temporary authority application under 49 U.S.C.A. § 310a(b) was granted and Constructors leased all of its properties to T.I.M.E. which then undertook to operate Constructors' business as part of T.I.M.E.'s trucking operations. During the time period while the remaining three applications were pending, T.I.M.E. dealt with the property substantially as its own. Old equipment was replaced with new, Constructors' books and records were moved to the main office of T.I.M.E., personnel of Constructors were absorbed into the business of T.I.M.E. and various obligations of Constructors were assumed and paid by T.I.M.E. The propriety of granting temporary authority and the scope of such a grant are additional key issues involved in this proceeding.

On June 28 and July 1 and 2, 1963, a consolidated hearing was held on the merger application, the financial application, and the application for a certificate of public convenience and necessity. Numerous objections to the proposals were raised by competitors of both trucking firms. However, the merger was approved; T.I.M.E. was permitted to issue stock to finance the transaction; the application to assume obligations was dismissed as moot since the assumption and payment of the obligations already had been consummated; and a certificate of public convenience and necessity was issued to T.I.M.E. covering the routes of Constructors.

There is no significant dispute as to any of the facts set out above. The controversy is concerned primarily with the question of whether this type of merger is possible under the amended law and secondarily with the question of whether the actions of these particular participants are in violation of the law.

The Interstate Commerce Act (49 U. S.C.A.) as originally formulated in 1935

provided that a motor carrier in interstate commerce needed a certificate of public convenience and necessity from the Interstate Commerce Commission in order to transport interstate freight. 49 U.S.C.A. § 307. There were, however, two exceptions to this requirement. 49 U.S.C.A. § 306(a) (1). In the first place those motor carriers in business prior to the enactment of the Act were granted the certificates upon proof of past operations under the "grandfather" provisions without the necessity of a fresh showing of public convenience and necessity. Secondly, and of importance in this case, was an exemption provided for carriers of interstate freight which operated solely within one state:

"And provided further, that this paragraph shall not be so construed as to require any such carrier lawfully engaged in operation solely within any state to obtain from the Commission a certificate authorizing the transportation by such carrier of passengers or property in interstate or foreign commerce between places within such state if there be a board in such state having authority to grant or approve such certificates and if such carrier has obtained such certificate from such board. Such transportation shall, however, be otherwise subject to the jurisdiction of the Commission under this chapter."

Such intrastate certificate obtained from the state agency was then registered with the Commission and interstate authority was automatically granted.

Situations arose where, as in the instate case, a multi-state operator wished to acquire the business of a single-state operator. Since the above quoted exemption was only applicable to single-state carriers, it became necessary for the purchaser in this situation to obtain a certificate of public convenience and necessity under 49 U.S.C.A. § 307. In the case of C. & D. Motor Delivery Co.—Purchase—Elliott, 38 M.C.C. 547 (1942), the Commission held that this type of transaction was within the scope of 49 U.S.C.A. § 5 providing for Commission approval of mergers and was thus under their control and jurisdiction. This interpretation was judicially approved in the case of Baggett Transp. Co. v. United States et al., 116 F.Supp. 167 (N.D.Ala. 1953). After taking jurisdiction in Elliott the Commission held that in determining the question of whether the multi-state operator should receive a certificate of public convenience and necessity in order to carry interstate freight over the routes used by the single-state operator under the exemption, it was proper for the Commission to consider the past operations of the single-state carrier under the exemption as evidence of the public convenience and necessity of the service. This administrative ruling was apparently never directly challenged and was tacitly approved by the court in Baggett, supra. There is no dispute that this procedure was consistently used for twenty years nor that everyone including the Congress understood that this was the practice prior to 1962.

Effective October 15, 1962, certain amendments were made to 49 U.S.C.A. § 306. The amendments eliminated the exemption for single-state carriers contained in § 306(a) (1) and added new §§ 306(a) (6) and (7). In summary the new § 306(a) (6) provides as follows:

1. Instead of being exempt the single-state carrier must now obtain a "certificate of registration" from the Commission.

2. To obtain such a certificate the single-state carrier must not be involved in any type of control relationship with a multi-state carrier.

3. To obtain such a certificate the single-state carrier must have an intrastate certificate from a state agency which shows that the state body considered the interstate convenience and necessity of the proposed route and has authorized interstate service within the limits of the authorized intrastate service.

4. The "certificate of registration" is issued by the Commission and is valid only as long as the above two conditions are met.

5. The "certificate of registration" is transferable within the limitations provided in 49 U.S.C.A. § 5 and 49 U.S.C.A. § 306. It may not be transferred apart from the intrastate certificate which supports it, and if the intrastate certificate is transferred apart from the certificate of registration, the right to engage in interstate commerce is destroyed.

6. If the intrastate certificate is suspended, there is a 180 day grace period before the interstate rights which it supports are lost. This allows the suspended party time to try to recover his state certificate.

7. The Commission has the power on its own to suspend the interstate rights.

8. Any party in interest which opposed the state authorization can petition the Commission for reconsideration and the Commission has the power to affirm, reverse or modify the state decision as to interstate routes.

In summary the new § 306(a) (7) authorizes "grandfather" rights which provide that anyone operating under the former exemption and continuing to so operate, may obtain a certificate of registration to cover his former operations. His former documents under the exemption are conclusive proof of the legality and scope of his interstate operations. The certificate of registration obtained under this section is subject to the same limitations as to control, transfer, and suspension of supporting state certificates as are applicable to the newly acquired certificates under § 306(a) (6).

The other sections of Title 49 involved in these proceedings are summarized in the margin.[1]

*Problems raised by the 1962 amendments to § 306.*

(a) *In relation to § 5 and § 310a(b).*

The plaintiffs argue that the merger approved by the Commission in this case (T.I.M.E. Freight, Inc.—Merger—Constructors Transport Co., 97 M.C.C. 310 (1965)) was not within the Commission's jurisdiction under § 5. Their argument is that when the business of Constructors was leased to T.I.M.E. under authority of § 310a(b) Constructors lost its status as a carrier under the Act and no longer held any carrier properties within the meaning of the Act. Basically, they urge that the only thing that made Constructors an interstate carrier and the only interstate properties it owned were its rights to a certificate of registration under the "grandfather" provisions of § 306(a) (7). These rights were lost according to the plaintiffs at the moment the property was leased to T.I.M.E. under the temporary authority order because this lease was either a transfer of the certificate of registration to a multi-state carrier forbidden by the amendments or was an operation of the rights of Constructors by T.I.M.E. which is a prohibited control relationship.

A further argument of the plaintiffs is that the operation of Constructors' properties by T.I.M.E. under the temporary order is a violation of the requirement in § 306(a) (7) that in order for a single-state carrier to qualify for a certificate of registration under the "grandfather" provisions, it must continue to operate under the exemption.

Finally, the plaintiffs argue that even under the Commission's theory that the rights of Constructors may be used as evidence on an application for a certificate of public convenience and necessity

1. 1. § 5(2)—Allows carriers within the jurisdiction of the Commission to merge their properties where the transaction is found by the Commission to be consistent with the public interest.

· 2. § 5(4)—Any type of control transaction other than that authorized by § 5(2) is unlawful.

3. § 310a(b)—Pending approval of an application under § 5(2), the Commis-

sion is empowered in its discretion to grant a temporary authority order which allows one company to operate the other within certain restrictions.

4. § 314—Makes § 20a applicable to motor carriers with certain exceptions not relevant here.

5. § 20a—Requires an application to the Commission for permission to issue stock and assume obligations.

by T.I.M.E. under § 307, there is still no transfer of such rights and thus no carrier properties.

It is the position of defendants that the *Elliott* procedures which authorized just this type of transaction under the jurisdiction of the Commission are still in effect and have been in no way altered by the amendments to § 306. Specifically, they urge that the applications under § 5(2) and under § 307 are interrelated and provide the necessary interstate character to the carriers and their properties.

(b) *In relation to § 307.*

The problem here is whether evidence of Constructors' past operation under the exemption should have been used by the Commission as the basis for granting a certificate of public convenience and necessity to T.I.M.E. to operate over the same routes.

Admittedly there can be no direct transfer of the certificate of registration from Constructors to T.I.M.E. It is also clear that aside from the possible problems of the temporary lease, there has not been a direct transfer of this certificate or the right it represents. The plaintiffs contend, however, that the *Elliott* procedures as used in this case accomplish the same forbidden purpose by indirection. Their position seems to be that presentation of evidence of past operations by a single-state carrier over the route in question will automatically result in a granting of a § 307 certificate to a multi-state carrier. The plaintiffs would urge that the services authorized by a certificate of registration and those authorized by a certificate of public convenience and necessity are completely different, and thus, evidence of operations under one is totally irrelevant on an application for the other.

With regard to the purpose of the 1962 amendments to § 306, the defendants contend that the second proviso exemption in the old statute was established in 1935 on the premise that the interstate operations of single-state carriers would be but a small fraction of their total business and very insignificant in the overall regulation of interstate commerce. Over the years, however, these single-state interstate operations became more significant and abuses arose in the use of the exemption provision. In the first place, the exemption provision was not interpreted to require the state agencies to consider interstate needs in the granting of the intrastate certificates which were then registered under the exemption. Since the agencies did not consider interstate needs many interstate routes were created under the exemption without any inquiry by anyone concerning their necessity. Secondly, various transfer practices were used to create duplicate routes. A multi-state carrier holding both an intrastate certificate and a certificate of public convenience and necessity under § 307 would sell the intrastate certificate to a single-state carrier who was eligible under the statute to utilize the exemption and thus create a duplicate route in interstate commerce. By the same token a single-state carrier or a multi-state carrier intending to become a single-state carrier could sell the § 307 certificate and then proceed to operate under the exemption for single-state carriers by registering its intrastate certificate. These practices greatly increased the number of interstate routes without any real regulation.

The Commission became concerned and proposed changes in the law that would have vested full control over single-state carriers operating in interstate commerce in the Commission; the idea being that henceforth these carriers would be treated like any other interstate carrier, and would be required to obtain regular certificates of public convenience and necessity from the Commission. The state agencies balked at this idea; denied the abuses; and urged that things be left the way they were. Out of this problem came the 1962 amendments which represented a compromise of the Commission and state agency positions.

The defendants assert that the aforementioned abuses and the eventual remedies thereto had nothing whatsoever to do with the *Elliott* case procedures. They argue that the *Elliott* case was, in fact, an administrative stopgap which had been used to remedy the abuses in certain situations; the position being that by holding in *Elliott* that the merger of a single-state carrier and a multi-state carrier was within § 5(2), the Commission brought this type of transaction under its scrutiny, thereby enabling it to place conditions on the transfer or retention of intrastate and § 307 certificates.

As might be expected, the plaintiffs see things somewhat differently. They admit that abuses of the second proviso exemption led to the desire for revision of the law, but assert that the *Elliott* procedures constituted one of those abuses. Their position is that *Elliott* permitted the growth of large multi-state operations which were not responsive to local needs. They contend that the whole idea of the amendments was to return control of all single-state operations to a completely local level.

The legislative history concerning the 1962 amendments is probably more significant in what it does not say than in what it does say. There were several alternatives brought up to solve the problems. There was concern expressed as to whether or not specific proposals affected the *Elliott* procedures. One proposal would have specifically codified the *Elliott* procedures but was not enacted. Yet the history does not reveal what any members of Congress felt about the *Elliott* procedures. Both sides seize upon general statements of members of Congress about preserving rights and laws as indicating that their position is correct but it is almost impossible to know the thoughts behind the statements. The plaintiffs would have this court believe that the fact that the version which would have codified *Elliott* was not enacted indicates direct opposition by Congress. However, the defendants' explanation that Congress probably did not think

specific codification was necessary is just as reasonable and equally without historical support. The most that can be garnered from the legislative history is a general picture of the basic purpose of the amendments and the positions of the parties appearing before the Congress at the time of enactment.

The history supports the defendants' position that the amendments were originally instigated by the Commission and were aimed primarily at the problems of states granting intrastate routes without considering interstate needs and the transfer of either intrastate certificates or certificates of public convenience and necessity by parties who had both certificates and would retain one thus duplicating services without any approval. 108 C.R. 1360–1361. It is clear that neither of these problems is related to the *Elliott* procedures. The plaintiffs repeatedly rely on general statements that an abuse sought to be remedied was the expansion of multi-state operations through linking of operations created through competitive services for which no need actually existed. They contend that this abuse was caused by mergers and the use of the *Elliott* procedures to allow continued operations over the same routes. In fact, however, this problem was also unrelated to the *Elliott* procedures and was explained by Congressman Harris to the House as follows:

"Let me illustrate the situation by giving an example. Let us take a motor carrier with interstate operating authority between New Haven, Conn., and Little Rock, Ark. This carrier would like to have a larger gathering area around New Haven. He finds that he cannot prove to the satisfaction of the ICC a need for enlarging his gathering area, because there are other interstate motor carriers now adequately serving the surrounding territory. So he induces his brother, or uncle to buy an intrastate certificate to operate in Connecticut. The brother or uncle then registers this certificate with the ICC, and obtains the right to handle

interstate shipments within the State of Connecticut covering not only the City of New Haven, but perhaps the entire State of Connecticut. Thus, the two individuals, working together in this manner, can create what is tantamount to a new interstate service without ever having to prove the need for the enlarged service before the ICC."
108 C.R. 1358

As can be seen from the quotation, the major concern *was not with the degree of proof* necessary before the Commission, but rather with the fact that much was being done *without any approval* of any sort.

The plaintiffs' statement that the purpose of the amendments was somehow to return these single-state operations to local control, is not borne out by anything. The plaintiffs admit, and the history confirms, that the Commission wanted more control; that the state agencies wanted things left as they were; and that the resulting amendments were a compromise of the two positions. How a compromise between all federal control and some local control is supposed to result in all local control is difficult to comprehend.

The history indicates that there is no statement by anyone which directly opposes the *Elliott* procedures. Mr. McBride of the American Trucking Association, one of the draftsmen of the amendments felt that the amended version preserved the *Elliott* procedures. Hearings on H.R. 2483 and S. 320 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 87th Cong., 1st Sess., pp. 40–41 (1961). The plaintiffs argue that others were concerned as to whether these procedures were in fact preserved. However, those persons they point to were admittedly in favor of retaining the procedures. The question still stands as to who, if anyone, opposed the retention of the *Elliott* procedures. It is conceded that there were basically four groups represented before Congress: the Commis-

sion, the American Trucking Association, the second proviso carriers who operated under the exemption for single-state carriers, and the state agencies. The plaintiffs admit that the Commission and the second proviso carriers favored retention of *Elliott*. They seem to admit that the American Trucking Association also favored retention [2], and the above noted statements of Mr. McBride of the A.T.A. would indicate that this was the case. That leaves only the state agencies that might have opposed retention. Even the plaintiffs acknowledged that the state agencies originally wished to have the whole matter left unchanged.[3] Apparently the plaintiffs contend that this position changed in respect to the *Elliott* procedures, yet they offer no good reason why it should have. All that *Elliott* really provides is that the operations authorized by the state agency may be used as evidence of the public convenience and necessity of the route when an application is made for a certificate of public convenience and necessity. The result of abandoning this interpretation (and what the plaintiffs seek) is to force the presentation of completely new evidence of public necessity and convenience to the Commission. While this may be helpful to competing carriers such as the plaintiffs, it is difficult to see what advantage this has for the state agencies, since it would make their past findings irrelevant and require the Commission to make a totally independent determination of the matter.

The plaintiffs contend, however, that even if the history does not support their position, the language of the amendments does.

Major reliance is placed upon the transfer and control provisions. The control provision states that the holder of a certificate of registration may not be in any control relationship with a multistate carrier while the transfer provision says that the limitations in the rest of the section apply to transfers. From this the plaintiffs argue that no transfer of the

---

2. See Plaintiffs' Opening Brief Pg. 18.

3. Plaintiffs' Reply Brief Pg. 20.

certificate of registration may be made to a multi-state carrier. The defendants agree. However, they point out that this is a mere codification of the prevailing practices under the former exemption. The former exemption was limited to single-state carriers and was interpreted to prevent control relationships with multi-state carriers. Wilson Storage & Transfer Co.—Purchase—Black Hills, 35 M.C.C. 67.

The question then comes down to one of whether the Commission's application of the *Elliott* procedures in this case permits doing indirectly what admittedly cannot be done directly. There are two answers. In the first place, the *Elliott* procedures were developed under the former exemption which, as was just pointed out, did not differ from the amendments on the matter of control and transfer limitations. Secondly, as the Commission pointed out in its decision below, a certificate of public convenience and necessity does not automatically issue upon proof of past operations under the former exemption or the new certificate of registration. 97 M.C.C. 324–325 and cases cited. The plaintiffs insist that one follows automatically from the other when, in fact, all that is done is to admit certain evidence into the determination.[4]

Temporary authority under § 310a(b) was often used in mergers involving carriers operating under the former exemption. As was stressed above, the former exemption like the new amendments, prohibited transfers to multi-state carriers. However, it was consistently held that the operations under the exemption might be continued by the multi-state carrier pending its application for a certificate of public convenience and necessity. Miller—Purchase—Newman, 57 M.C.C. 395. There is no indication of any change in the law which would affect this power to preserve properties pending Commission action.

The argument that there are no carrier properties, and the argument that Constructors is not a carrier, are likewise defeated when it is realized that transfer of exemption rights to a multi-state carrier was impossible under the old law. The Commission, however, held in *Elliott* that a § 5 merger proceeding could be combined with an application for a certificate of public convenience and necessity under § 307 in order to provide the jurisdiction. This approach was approved in *Baggett*, supra. There is no indication of any reason to change this approach.

The only really new matters supplied by the amendments are the requirements that the states make a separate determination of interstate needs and the restriction on the transfer of the new certificate of registration without the intrastate certificate. The first change is clearly directed at the abuses noted by the defendants. It prevents the automatic creation of new routes without regard to interstate needs and prevents duplication of routes since one party cannot now hold both a certificate of registration and a certificate of public convenience and necessity. Before the amendments a party could hold both an intrastate and a § 307 certificate and through sale or registration duplicate his present route. The other new matter seems clearly designed to prevent future abuses. Just as one of the old problems arose from an ability to hold two certificates and use them to duplicate routes, a similar problem could have arisen if a party could have sold his certificate of registration, retained his intrastate certificate, and then obtained a new certificate of registration for the same routes on the basis of his intrastate rights.

■ In summary, then, the *Elliott* procedures under either the old or amended laws did not and could not have transferred rights limited to single-state

---

4. The Commission recognizes that evidence of prior operations is not necessarily controlling in considering an application

for a certificate of public convenience and necessity. T.I.M.E. Freight, Inc.—Merger, 97 M.C.C. 310, 329 (1964).

carriers to multi-state carriers. All they did was to provide that in a hearing on public convenience and necessity past operations by single-state carriers over the route were relevant evidence of a need for the service. The changes wrought by the amendments seem directed at the problem of the creation of new routes without any consideration of interstate needs rather than at altering the evidentiary requirements on a hearing before the Commission on an application for a certificate of public convenience and necessity. Nor do the amendments seem to be aimed at redefining the control and jurisdiction of the Commission in respect to mergers under § 5.

Irrespective of any problems under § 306, the plaintiffs have other complaints concerning this merger. The facts in this case show that following the grant of temporary authority under § 310a(b) Constructors' operations were absorbed into T.I.M.E. Further the facts show that T.I.M.E. assumed and paid some $93,000 worth of obligations of Constructors during the temporary authority period. These were the same obligations that T.I.M.E. had sought to assume and pay by application under § 20a and § 314. The plaintiffs object that the actions of T.I.M.E. violate § 5(4) prohibiting control transactions not authorized under § 5(2) and violate both § 20a and § 314 by circumventing the required prior Commission approval of the assumption and payment of obligations. On the first point the Commission held that the authorization under § 310a(b) was broad enough to allow control that would otherwise violate § 5(4). As to the second point, the Commission also held that § 310a(b) was broad enough to permit the assumption and payment and thus the § 20a and § 314 applications had become moot.

Section 310a(b) provides that pending approval of a merger application under § 5, the Commission is empowered in its discretion to grant a temporary operating authority for a period not to exceed 180 days:

"[I]f it shall appear that failure to grant such temporary approval may result in destruction of or injury to such motor carrier properties sought to be acquired, or to interfere substantially with their future usefulness in the performance of adequate and continuous service to the public."

The plaintiffs argue that this section should be read together with § 5(4) which prohibits any control transaction other than those authorized under § 5(2). The result they say is a sort of independent entity theory based on the idea that all that can be authorized under § 310a(b) is the operation of Constructors as a separate enterprise. They argue that the whole idea is to preserve the assets so that they may be returned if the transaction is not approved.

The defendants argue that § 310a(b) must be read with § 5(2). They reason that § 310a(b) can be used to temporarily authorize anything that may be permanently authorized under § 5(2) where the purpose is to preserve the properties of Constructors.

■ Section 5(4) prohibits any control relationship not authorized by § 5(2). Thus, the independent entity theory is worthless. If the plaintiffs are correct that § 310a(b) is limited by § 5(4) then it must be fully limited. Even if T.I.M.E. had kept Constructors' operations completely separate from its own, T.I.M.E. would still have been in control and thus in violation of § 5(4) unless § 310a(b) is read as coming in with § 5(2) as the defendants contend. The defendants must be right; otherwise § 310a(b) could not be used to authorize anything. If a transaction were not such as to come within § 5, there would be no need to get any authority to do it in any event. The restrictions in § 310a(b) relating to preservation of properties for service to the public seem to be directed at the question of when temporary authority should be granted rather than at the determination of the scope of the grant.

The problem with respect to §§ 20a and 314 is much more difficult. Sections 20a(2) and (11), which are applicable to motor carriers by reason of § 314, read as follows:

"(2) It shall be unlawful for any carrier * * * to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses * * * of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such * * * assumption. The Commission shall make such order only if it finds that such * * * assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose: * * *."

"(11) Any security issued or any obligation or liability assumed by a carrier, for which under the provisions of this section the authorization of the commission is required, shall be void, if issued or assumed without such authorization therefor having first been obtained, * * *."

■ The Commission's decision that these applications were moot cannot be correct since § 20a(2) clearly requires the Commission to make the requisite determination of necessity for the assumption.

Section 310a(b) temporarily authorizes operations pending action on a § 5 application. In the first place the assumption of these obligations is not temporary. Secondly, and more important, is the fact that the assumption of obligations cannot be authorized under § 5. T.I.M.E. and Constructors both recognized this and made the application under §§ 20a and 314. It is difficult to see how § 310a(b) which authorizes a party to do certain things pending approval of a § 5 application can be used to authorize a transaction which would be no good even if the § 5 merger were approved.

■ Because of this defect, the matter is remanded to the Commission for a determination of the propriety of the assumption of obligations. If the Commission grants the application made under §§ 20a and 314, the parties will comply with the order and the matter will end there, as the Commission's decision is correct in all other respects. If the Commission should decide that the assumption was not for the proper purposes, then it will be necessary to make adjustments between the parties to the merger.

No. 65–555

This is an action to set aside the order and decision of the Interstate Commerce Commission entered on March 18, 1965. Jurisdiction and venue in this action have been stipulated and rest upon 28 U.S.C.A. §§ 1336, 1398, 2284, and 2321–2325.

As in the companion case (Navajo Freight, 65–494–WB) the controversy in this matter centers on the Commission's interpretation of various provisions of the Interstate Commerce Act in relation to a proposed merger. In this case Nevada-California Express, Inc., of Reno, Nevada (NCE), was merged into Delta Lines, Inc. of Emeryville, California.

NCE, prior to the merger, was a trucking firm doing business between Nevada and California primarily around the Reno and Lake Tahoe areas. It held a certificate of public convenience and necessity from the I.C.C. authorizing its interstate operations.

Delta, prior to the merger was a trucking firm operating solely within the State of California. Its intrastate operations were conducted under certificates issued by the California Public Utilities Commission, and its interstate operations were conducted under the statutory exemption in 49 U.S.C.A. § 306, which was effective until October 15, 1962.

By an agreement entered into on October 15, 1962, Delta agreed to purchase from the then owner all of the stock of NCE. An application for approval of the purchase transaction under 49 U.S.C.A. § 5 was filed with the I.C.C. on April 16, 1963. The purchase was approved and the transaction consummated. This order is *not* being challenged in these proceedings.

The acquisition by Delta of NCE changed Delta from a single-state into a multi-state carrier. As noted above, Delta had engaged in interstate commerce under the old statutory exemption for single-state carriers. In addition Delta had timely filed for a certificate of registration under the "grandfather" provisions of the new 49 U.S.C.A. § 306 (a) (7). However, the exemption under the old law was, and the new certificate of registration is, only applicable to single-state carriers. Thus, in order to continue transporting interstate shipments over its own California routes, it became necessary for Delta to acquire a certificate of public convenience and necessity from the I.C.C. Such an application was filed and consolidated for hearing with the merger application.

Delta relied upon its own past operations over these routes under the old exemption and the new certificate of registration as proof of public convenience and necessity on its application for a certificate of public convenience and necessity. The plaintiff objected to this evidence on the ground that the type of services authorized under the old and new provisions for single-state carriers are different from the type authorized by a certificate of public convenience and necessity. The Commission, relying on its decision in the case of T.I.M.E. Freight, Inc.—Merger—Constructors Transport Co., 97 M.C.C. 310 (1965) (the companion case on review in this court 65–494), concluded that the *Elliott* case (C. & D. Motor Delivery Co.—Purchase—Elliott, 38 M.C.C. 547 (1942)) procedures were still applicable under the amended statute and thus that past operations could be considered as evidence on an application for a certificate of public convenience and necessity. The certificate was granted to Delta and it is this decision and order which is under attack here.

The only real question before the court in this case is whether the 1962 amendments to 49 U.S.C.A. § 306 eliminated the administrative procedures developed in the *Elliott* case which provided that operations under the old statutory exemption were evidence of public convenience and necessity.

For the reasons stated in 65–494, we believe the *Elliott* case procedures are still applicable. There is no doubt that the authorizations to Delta under the exemption and the certificate of registration are different from the one sought under § 307. That does not mean, however, that the fact that Delta has been carrying interstate shipments over these routes may not be used as evidence of the need for continued interstate service over the route under the authority of § 307.

This is the only problem in this case and thus, the decision of the Commission granting the certificate of public convenience and necessity to Delta is correct.