**CAPE AIR FREIGHT, INC., a corporation, Petitioner,**

v.

**The UNITED STATES of America and Interstate Commerce Commission, Respondents,**

**Film Transit, Inc., et al., Intervening Respondents.**

**No. 77–1187.**

United States Court of Appeals, Tenth Circuit.

Submitted Aug. 11, 1978.

Decided Nov. 6, 1978.

Rehearing Denied Dec. 28, 1978.

---

Warren H. Sapp, Kansas City, Mo., for petitioner.

Wayne M. Senville, I. C. C., Washington, D. C. (John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, and Edward Lawson, Dept. of Justice, and Mark L. Evans and Henri F. Rush, Gen. Counsel, Washington, D. C., on the brief), for respondents.

Thomas A. Stroud, Washington, D. C. (Robert G. Shepherd, Jr., Memphis, Tenn., on the brief), of Goff, Sims, Cloud, Stroud & Shepherd, Memphis, Tenn., and Denver, Colo., for intervening respondents.

Before McWILLIAMS and BARRETT, Circuit Judges, and COOK, District Judge.*

BARRETT, Circuit Judge.

This proceeding is before us on a petition for review filed by Cape Air Freight, Inc. (Cape) of orders entered by the Interstate Commerce Commission (ICC) requiring Cape to cease and desist from certain operations and practices in performance of some certificated transportation services. The orders arise from proceedings initiated January 30, 1973, on a "Petition Under Rule 102 Seeking Extraordinary Relief" filed by some nine (9) intervening motor carriers operating under ICC certificates, each of whom are competitors of Cape. The ICC treated the petition as a complaint to either cancel or modify the challenged Cape certificates.

Following certain procedural skirmishes, Cape filed an "Offer to Satisfy Complaint and of Settlement" on January 28, 1975. The offer and settlement was denied by the Administrative Law Judge (ALJ). Thereafter, following hearings, the ALJ rendered his Initial Decision on January 7, 1976. He found that Cape did not render its authorized air freight transportation services on its own and that Cape had been operating unlawfully by obtaining the contractual services of certain "agents" over which Cape exercises little, if any, actual control in the performance of its transportation service, all in violation of Sections 203(c), 206(a) and 216(b) of the Act, 49 U.S.C.A. §§ 303, 306 and 316. Cape was ordered to cease and desist such operations and directed henceforth to utilize employees, terminals and vehicles under its direct control and supervision. The Initial Decision was affirmed by the ICC. This petition for review followed. Cape is a Kansas corporation and

* Of the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

maintains its principal offices in that state. Jurisdiction is conferred upon this court by virtue of 28 U.S.C.A. § 2341, *et seq.*

At the commencement of the proceedings before the ALJ on March 4, 1975, Cape moved for dismissal of the complaint and proceedings based upon its offer of settlement prepared and submitted to the ICC on January 28, 1975, *which was accepted by the ICC's Bureau of Enforcement on February 18, 1975.* The offer of settlement constituted an agreement by Cape to effect substantial changes in its working arrangement with "agents" in order to assure that Cape would assume substantial "control" and "responsibility," to-wit:

—All agents have been or will be made district managers and full-time employees of the company.

—All district managers will be subject to full operational control by three regional managers, one each for operations in the Southern, Midwestern and Eastern areas we serve.

—All sales, solicitation and advertising will be for Cape alone, and not in connection with any other organization.

—All banking is handled by Cape personnel through Cape bank accounts.

—All telephone lines are acquired by Cape and for its use alone.

—All equipment is properly placarded and devoted solely to Cape's operations.

—All freight bills and shipping documents are limited to Cape alone (except in cases of interchange or interline arrangements, where necessary).

—All billing, and other paper work is controlled through the company's central office, through review, although receipts, collections, etc., are handled at the district office level.

—All district and regional managers are authorized and encouraged to review any difficulties with me, our counsel and Commission field personnel as they arise.

—All insurance is consolidated under policies obtained, bought and paid for by Cape. Formerly, each district office maintained its own policies. This process will be completed on April, when the last district office policy lapses.

—All territorial restrictions on the district managers have been removed, and they are responsible, with the help of regional managers, for the fullest utilization of any company equipment in their area.

[R., Appendix, pp. 237–238; R., Appendix, Motion to Dismiss, pp. 159–168.]

The ICC's order of August 19, 1974, dismissed the complaint filed against Cape, *except* for allegations relating to Cape's authorities in MC–134906 and Subs 1, 2, 4 and 5 thereunder for failure to exercise control and responsibility or to perform operations in accordance with Section 216(b) of the Act. *The intervening complainants sought in these proceedings to seek revocation of Cape's certificates above identified which, under Section 212(a) of the Act, 49 U.S.C.A. § 312, requires proof of "willful failure" to comply with the provisions of the Act or any lawful rule, regulation or order of the ICC promulgated thereunder.* Cape's contention, in resistance to further proceedings on the allegations of the complainants following Cape's filing of its offer of settlement, was two-fold: (a) the ICC's "Corrected Order" of August 19, 1974 rejected the complainants' efforts to obtain *revocation* of the Cape certificates based upon the alleged "willful failure" by Cape to render proper, adequate and continuous service; the "Corrected Order" thus confined the proceedings on the complaint:

. . . for oral arguments for the sole purpose of determining whether [Cape] pursuant to its authorities contained in MC–134906 and Subs 1, 2, 4 and 5 thereunder, *is failing to exercise control and responsibility or perform operations thereunder in violation of Section 216(b) of the Act*; . . . .. (Emphasis supplied.)

[R., Appendix, pp. 169, 170.]

and, (b) after the ICC eliminated any consideration of the *revocation* of the challenged certificates and authorities contained in MC–134906 and Subs 1, 2, 4 and 5 thereunder, Cape cooperatively subjected itself to lawful ICC cease and desist orders

relative to the allegations that it had failed to exercise "control and responsibility." Cape contends that this was accomplished, without acknowledgment of wrongdoing, through its "Offer to Satisfy Complaint and of Settlement" filed January 28, 1975, which was accepted by the ICC's Bureau of Enforcement on February 18, 1975. Cape argues that the offer of settlement constitutes its full agreement to perform all of the changes in its practices, policies and methods of operations required to assure that it maintain that degree of control, supervision and responsibility deemed necessary by the ICC's Bureau of Enforcement. Cape bolsters this contention by pointing to the extensive changes it had made and those yet to be made under the guidance of the ICC's Bureau of Enforcement evidenced by letter-report of November 20, 1974. [R., Appendix, pp. 274–277, 282.]

The intervening complainants refused to consider Cape's offer of settlement, notwithstanding the Bureau of Enforcement's acceptance. On February 18, 1975, the complainants filed a reply to Cape's "Offer to Satisfy Complaint and of Settlement" and to the Bureau of Enforcement's acceptance of that offer. [R., Appendix, pp. 173–179.] That reply contained: (a) a reiteration that the complainants seek *revocation* of the subject certificates (notwithstanding that the ICC had already determined that revocation was not to be considered) apparently grounded on Section 212(a) of the Act which provides for revocation upon "complaint" from one other than the ICC upon proof of Cape's *willful failure to comply*, (b) insistence that the information in the possession of the Bureau of Enforcement would (contrary to the prior determinations of the ICC and the Bureau) . . . "show that Cape has, since its inception, continuously and willfully failed to provide service under its certificates in violation of Section 216(d) . . ." [Appendix, p. 177.], (c) allegation that the Offer of Settlement and Satisfaction of Complaint filed by Cape is of *no value* because it admits of no wrongdoing, offers no description of the activities which Cape will agree to cease and offers no facts upon which a determi-

nation of the willful nature of those violations can be made, and (d) a contention that the complaint should be that of the ICC; acknowledgment that the Bureau of Enforcement has pursued extensive investigation into Cape's services upon request of complainants; allegation that complainants are not "privy" to the Bureau's investigative reports and therefore cannot proceed upon them and that the ". . . Bureau should not be allowed to rob complainants of the facts which prove their allegations . . .." [Appendix, p. 179.] Thus, the hearings proceeded upon the investigative report-evidence of the Bureau of Enforcement which had, based thereon, accepted Cape's offer of settlement. The record reflects that none of the complainants presented any evidence at the hearing before the ALJ.

In Cape's response to the objections of complainants, Cape observed that while the complainants insist upon seeking *revocation* of Cape's certificates, this matter had already been decided adversely to complainants by the ICC; thus the only issue remaining was that of Cape's "control" over and assumption of "responsibility" for services performed by its agents. Pertinently, Cape contended that (a) its offer of settlement was acceptable to the Bureau of Enforcement which had conducted two extensive investigations of Cape's operations, (b) the Bureau of Enforcement did not believe that further hearings were necessary, and (c) because complainants had no evidence to present independent of that introduced by the Bureau of Enforcement, the Bureau's recommendation for acceptance of the terms of the offer of settlement should have been adopted.

Notwithstanding the above related background, when the matter came on for hearing before the ALJ on March 4, 1975, the judge refused to grant Cape's motion to dismiss the complaints based upon Cape's willingness to comply with an order directing that the terms of the offer of settlement be adopted, coupled with an appropriate ICC cease and desist order. At the hearing, these preliminary discussions pre-

ceded the Judge's order denying the Cape motion, *inter alia*:

*Mr. Kretsinger* (for Cape): Your Honor, this proceeding has been pending for some time. . . . It has been through the Commission on many, many allegations of various activities which were alleged to be unlawful, and which have all been resolved by Division 1, *other than the question of whether or not the proper control of the operations is in effect by the carriers.*

The Bureau of Enforcement was directed to appeal, enter an appearance and participate in the proceedings. An extensive investigation was made. After that investigation was made, [7] the Bureau's attorney and we entered into discussions for a proper solution to that issue and we have agreed to a cease and desist order as to certain facets of the, I suppose, indicia of control which were determined to maybe not suffice to meet the standards of the substantial control.

*An offer of settlement was prepared and revised and finally submitted to the Commission. A reply was made by the Bureau accepting the offer as far as they were concerned. Mr. Goff, on behalf of his clients, also filed a response not accepting the offer and stating that he had no further evidence to put in, in any event, but he would kind of like to have the Bureau put all their evidence in.*

That is the status as I see it.

If this case went through several days of hearing and an order was issued, a recommended order was issued, petitions, replies, exceptions, all these kind of pleadings going on for a couple more years, it *would not accomplish any more, at the most, than an order of the Commission requiring the respondent to cease and desist from the operation alleged to be unlawful or alleged to be not having proper control of the operation.*

*Now, the offer has been made, it is enforceable in court if the cease and desist order is entered, and the adverse effect of one or two more years of litigation on the respondent would be very damaging, it has been damaging up to* this point, we consider, to the tune of many, many thousands of dollars.

█ There is a competitive fight going on between the complainants and the respondent. As far as I can see, the only result we are trying to arrive at in this proceeding is to determine and assure that respondent has proper control over his operations. That is the only issue left.

Now, if the facts of that control are of record, and they are set out in the APA letter which was served last week, and respondent agrees to cease and desist from the operations alleged to be, I can't say illegal, I'll say not within the proper control and responsibility of the respondent, I see no further purpose in proceeding here this morning.

I believe that if Mr. Goff starts the case off, he will probably say that they have no evidence to produce. That is what he said in his response. This indicates to me that there is really nothing to be here for this morning except for the Judge to accept the offer of settlement and recommend the offer of settlement be accepted and a cease and desist order be issued pointed toward the things and other matters in the APA letter.

That is our position this morning.

*Judge Sarbacher*: Does the Bureau have any further comment to make?

*Mr. Kapnistos: The Bureau's response would be, Your Honor, that we have no objection to the offer of settlement submitted by the defendant.*

*Judge Sarbacher*: The complainants?

*Mr. Goff*: Your Honor, Mr. Kretsinger is quite right that this proceeding has been of some duration. The first pleading which I filed in this matter was in January of 1973 and certainly there have been pleadings filed since then. I hold in my hand the two submissions which I have made on behalf of the complainants, which are about 700 pages long, and which are, to some extent, briefs, but basically they are verified statements of the complainants and other folks.

The plain truth was that we took this case as far as we were then able to take it, not being private investigators and not, at that time, having much leverage to go to see Mr. Clair or any other one of these folks and say that we would like to have you tell us about these operations and so show us your records and what have you.

*We took it as far as we could, then we asked that the commission have the Bureau of Enforcement enter this case and to do whatever investigation it could and then to help us make a record. For that reason, we understand that the Commission did tell the Bureau to intervene. It has done so. It has made, I assume, extensive investigations. I have not seen them because I am not privy to them.*

We originally asked the Commission to either cancel this certificate of Cape Air Freight or modify them. We also alleged that they had never operated the certificates and that, [10] in fact, it was a big franchising operation, that is, that they have agents all over the place to actually perform the service and they do very little. We have never retreated from that position. I think I set forth what I want to do in our reply, which I am sure that Your Honor has a copy of.

\* \* \* \* \* \*

Now, we come up to this case and the Bureau investigates apparently seven of their agents and they come to me with an offer of settlement that says we don't admit that we did anything wrong, but whatever it is you said we did, we will quit with respect to these seven people only. Now, I am proceeding under Section 2(12)(b) [212(b)] of the Act. I have asked from the first day of this proceeding that these certificates either be cancelled [11] or that they be modified and I have asked it on several different grounds. Today we are proceeding on the grounds that they have never operated the certificates.

*In order for this complaint to have any substance, it must proceed, as the statute says, to show that all of this activity was willful, that is to say that they knew they were doing it, that it has been done all along, that they knew they were doing it and they have continued to do it.* It does not serve the purpose of the complaint which I filed for these gentlemen to take a cease and desist voluntarily in which they say they did nothing wrong, but whatever it is you said we did, we will quit. (Emphasis supplied.)

\* \* \* \* \* \*

[R., Appendix, pp. 186–189.]

After the ALJ denied Cape's motion, he directed the Bureau of Enforcement to present its witnesses. This procedure was strongly protested by both Cape and the Bureau. Their position was that the burden of proof under the circumstances and posture of the proceeding was on the complainants as proponents of the order requested. [R., Appendix, pp. 194, 195, 196.]

The hearing proceeded. The Bureau presented one witness, a Mr. Vernon Cable, the ICC's District Supervisor at Kansas City, Missouri, who had conducted the detailed investigations of Cape's operations and of Cape's "agents." In addition to Cable's testimony, the Bureau introduced in evidence multiple page exhibits. *None* of the complainants presented any witnesses. Thus, the ALJ's Initial Decision rendered December 18, 1975, was predicated on the evidence presented by the Bureau. That decision referred to the "changes" proposed by Cape in its Offer of Settlement, noting that certain of the "changes" had already taken place but that it was impossible to determine whether all of them had been effected. Even had the "changes" been made, the ALJ found and concluded, *inter alia*:

. . . that such changes are insufficient to constitute control and the pertinent administrative and operational responsibility on the part of Cape for the operations conducted pursuant to the authority set forth in Certificate No. MC–134906 and subs thereunder. Mr. Clair can cancel the "agency" contracts and replace them with "employment" contracts; he can instruct "agents" to open

bank accounts in Cape's name, and list telephones in Cape's name; he can purchase "front" insurance; and he can even set up a central computer system, for which the "agents" will be billed for a computer service fee. None of these render any transportation service of its own. The transportation service rendered under the authority set forth in Appendix A hereto is being rendered by "agents" which do not hold pertinent authority from this Commission. In essence, Cape is providing a centralized, nontransportation service for its numerous "agents," a service for which Cape is fully reimbursed by each of the "agents" on the basis of a specified percentage of the "agent's" gross revenues.

## VII

In view of the evidence of record and the pertinent case law, it is here concluded that (a) Cape does not render any transportation service of its own; (b) the transportation service which is being rendered under Cape's certificates are operations performed by "agents" over which Cape exercises little if any control; (c) that the foregoing constitutes a violation of section 216(b) of the Interstate Commerce Act; (d) that the involved transportation service performed by the "agents" constitutes unauthorized operations which are in violation of sections 203(c), 206(a), and 209(a) of the Act; (e) that Cape has been aiding and abetting the "agents" in their violations of the Act; and (f) that all such operations must cease.

## VIII

In order to insure that the violations cease, there will be entered herein an order requiring Cape to cease and desist all operations found herein to be unlawful. *Also, Cape is hereby admonished to discontinue all operations conducted through the use of "agents", and henceforth its operations must utilize company employees, company terminals, and company vehicles, all of which are under the direct control and supervision of Cape.* (Emphasis supplied.) [R., Appendix, pp. 237–238, 240–241.]

The ALJ also entered a cease and desist order requiring Cape to refrain and abstain from all such unlawful operations and practices and " . . . hereafter to exercise the necessary control and administrative operational responsibility in performing a transportation service . . ." within the criteria set forth in *Performance of Motor Common Carrier Service by Riss & Co., Inc.,* 48 M.C.C. 327 and cases cited therein. [R., Appendix, p. 245.]

On July 12, 1976, the ICC, Division I, affirmed the statement of facts, conclusions and findings of the ALJ. Cape was ordered to cease and desist its unlawful operations and to comply with 49 CFR § 1100.99. Upon review of Cape's petitions for reconsideration, the full Commission denied same and ruled that the findings of Division I are "in accordance with the evidence and the applicable law." This appeal followed.

On review, Cape contends that:

(1) the finding of a violation and the requirements of the Commission's order are not justified by the facts of record or the applicable law, serve no legitimate remedial or regulatory purpose, are improperly punitive in character, fail to reflect the required exercise of judgment in tailoring any remedy required to the facts of the case, and constitute an improper invasion of matters properly left to managerial discretion, (2) the activities of Cape complained of are wholly consistent with the Interstate Commerce Act and the Commission's regulations; and the principal decision relied on by the Commission to sustain its order, *Performance of Motor Common Carrier Service by Riss & Co., Inc.,* 48 M.C.C. 327 (1948), was itself subsequently modified to relieve the carrier of the harsher aspects therein which were imposed on Cape, (3) the Commission erred in considering the allegations of the complainants' Statement of Position as a complaint without having granted leave for the filing of an amended complaint or service as required

in former Commission Rule 34 (49 C.F.R. § 1100.34, now amended to 49 C.F.R. § 1100.32), and in rejecting the Offer to Satisfy the Complaint and, (4) the decision of the Commission, and its refusal to institute a general investigation, improperly singles out Cape for requirements inconsistent with the requirements of those similarly situated, improperly fails to take into consideration the anticompetitive effects of the order issued, and fails to sufficiently disclose the basis for its decision to permit intelligent review thereof by the Court.

[Brief of Petitioner, pp. 14, 30, 40, 41.]

We believe that this review can be properly disposed of by considering two fundamental aspects of this dispute. The first involves the issue of Cape's alleged failure to exercise adequate control and responsibility over its certificated operations. The second involves the issue whether the terms and provisions of the offer of settlement should have been accepted by the ICC and appropriate orders entered thereon rather than permitting further enforcement proceedings to be pursued before the ALJ.

## I.

Cape insists that its "activities," i. e., its operational arrangements with its agents do not violate the Act or any law because the use of leased vehicles is specifically authorized, the use of agents is implicitly recognized by the ICC and, most significantly, " . . . there is not a shred of evidence . . . that the shipping public is not receiving the service authorized under Cape's certificates; that the organizational structure as opposed to Cape's ability to compete—is in any way harming the complaints; or that the Commission's powers of enforcement are in any way impaired." [Brief of Cape, pp. 15, 16.]

Cape relies substantially on *Thomson v. United States,* 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513 (1944). Cape misses the mark. The issue in *Thomson* was not akin to the issue presented here. Even so, the Supreme Court held in *Thomson* that the railroad, which employed certain motor vehicle oper-

ations as an integral part of its railway service, must maintain rigid control:

[The Railway] fixes the truck schedules so as to coordinate them with the rail schedules and designates the amount and particular shipments of freight to be moved. The motor vehicle operators issue no billing of any kind and solicit none of the freight transported for the railroad. They have no contractual or other relationships with either the shippers or the receivers of the freight. Their trucks are loaded at the freight stations by railroad employees, sometimes assisted by the truck drivers. After a truck is loaded a manifest is issued by the railroad's agent . . .; upon delivery of the freight to another railroad freight station the manifest is signed by another railroad agent . . . .

321 U.S. at pp. 21, 22, 64 S.Ct. at p. 393.

The provisions and actual operation of the contracts with the [motor vehicle] operators demonstrate the railroad's rigid control over the movement of the freight and its retention of full responsibility to the shippers. The operators are "independent" only by grace of contract nomenclature. By any realistic test they are mere aids in carrying out a part of the railroad's coordinated rail-motor freight service.

321 U.S. at p. 25, 64 S.Ct. at p. 395.

49 U.S.C.A. § 304(a)(1) provides that it shall be the duty of the Commission:

(1) To regulate common carriers by motor vehicle and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operations and equipment.

49 CFR § 1057 contains the ICC's leasing regulations, which require that the ICC approve the *form of a lease* to insure that the equipment is under the actual control of the lessee.

In *Transamerican Freight v. Brada Miller, etc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975) the Court was concerned with the "control and responsibility" requirement of the ICC's equipment leasing regulation, 49 CFR § 1057.3(a) (1975). The narrow question was whether the ICC's "control and responsibility" requirement prohibited, as a matter of public policy, an agreement between the carriers whereby the lessor (Brada Miller Freight Systems, Inc.), which was not a certified ICC carrier, agreed to indemnify and hold harmless Transamerican Freight Lines, Inc., which held authority from the ICC to serve the points involved:

> . . . from any and all claims, suits, losses, fines or other expenses arising out of, based upon or incurred because of injury to any person or persons, or damage to property sustained or which may be alleged to have been sustained by reason of any negligence or alleged negligence on the part of [Brada Miller], its agents, servants or employees . . . . Nothing in this Paragraph 9 contained shall be construed to in anywise limit the liability of [Transamerican] to the public in connection with the use of said equipment under this agreement.

423 U.S. at p. 31, 96 S.Ct. at p. 231.

Paragraph 4 of the same agreement provided that during the term of the lease, Transamerican " . . . shall have the control and responsibility for the operation of said equipment in respect to the public, shippers and Interstate Commerce Commission . . . ." 423 U.S. at p. 31, 96 S.Ct. at p. 231.

While a leased vehicle was being operated under the lease agreement, an accident occurred. Suit was filed against the two carriers. Transamerican settled the claim and thereafter sought recovery against Miller under the indemnification clause. The District Court granted Miller's motion for summary judgment on the ground that the indemnification clause contravened ICC regulation 49 CFR § 1057.43(a) (1975) which requires that lease agreements between regulated carriers must contain a written understanding that "control and responsibility for the operation of the equipment shall be that of the lessee." The court of appeals affirmed. The Supreme Court reversed, holding that the indemnification agreement does not contravene the ICC's control-and-responsibility requirement in that the control over the vehicle did remain with Transamerican and that the furnishing of Miller's driver involved only ministerial control and not a delegation of responsibility for the shipment. Further, the Court held that the indemnification provision did not conflict with ICC safety regulations, because such a provision, which places ultimate financial responsibility on the negligent lessor, may tend to increase rather than diminish protection of the public.

In *American Trucking Associations, Inc. v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), the Supreme Court considered, in part, ICC Rule 207.4, 52 M.C.C. 744, which dealt with augmenting equipment obtained by an authorized common carrier from a carrier not so authorized. The rule permitted the authorized carrier to contract, lease or otherwise arrange for the use of equipment from one not so authorized. The authorized carrier was permitted to contract, lease or otherwise arrange for the use of equipment from one not authorized provided that the " . . . exclusive possession, control and use of the equipment, and . . . complete assumption of responsibility in respect thereto [be assumed] by the authorized carrier." The appellant, American Trucking Associations, Inc., contended that the Interstate Commerce Act (as distinguished from ICC Rule 207.4, *supra*) does not permit the ICC to control, regulate or affect leasing practices nor does the Act grant any implied power to do so. The Supreme Court rejected these challenges and upheld Rule 207.4 as within the power of the ICC:

> [Appellants] . . . urge upon us the fact that nowhere in the Act is there an express delegation of power to control, regulate or affect leasing practices, and . . . there is no direct implication of such power. . . . As a matter of principle, we might agree with appel-

lants' contention if we thought it a reasonable canon of interpretation that the draftsmen of acts delegating agency powers, as a practical and realistic matter, can or do include specific consideration of every evil to be corrected. But no great acquaintance with practical affairs is required to know that such prescience, either in fact or in the minds of Congress, does not exist. . . . Its very absence, moreover, is precisely one of the reasons why regulatory agencies such as the Commission are created, for it is the fond hope of their authors that they bring to their work the expert's familiarity with industry conditions which members of the delegating legislatures cannot be expected to possess. . . . The purpose of the rules is to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system. . . . Section 204(a)(2) requires the Commission to impose rules relating to safety of operations for vehicles and drivers. These are likewise threatened by the unrestricted use of nonowned equipment by the common carriers.
344 U.S. at pp. 309, 310, 73 S.Ct. at pp. 314.

The ALJ found, in summary, based upon the record that Cape's "agents" had:
(1) assumed the cost of vehicle operation and maintenance, insurance premiums, and telephone service, (2) furnished officer and terminal facilities, (3) hired and fired employees, (4) withheld employee deductions, (5) solicited traffic, (6) picked up and delivered freight, (7) prepared freight bills, (8) controlled the dispatching of vehicles, (9) received customer calls for service, (10) collected freight charges, and (11) investigated, paid, and maintained files for loss and damage claims.

Cape does not directly challenge these findings. It does, however, contend that because the use of leased vehicles is authorized by law, the use of agents is thus implicitly recognized by the Act. Further, Cape argues that inasmuch as the nature of

a carrier's arrangements for terminal and office facilities and like services are not subject to regulation, the inquiry should be directed only to one issue: Has the shipping service the public is entitled to as authorized under Cape's certificates been fully, properly and adequately performed and supplied? We agree with Cape's assertion that the record *does not* evidence that the services required under Cape's authorities have not been fully, properly and adequately performed. Even so, the record reflects that Cape recognizes the validity of the ICC's requirement that it (Cape) exercise direct "control and responsibility." This recognition, in our view, is evidenced implicitly by reason of Cape's offer of settlement.

■ We hold that the ICC requirements of "control and responsibility" are valid and enforceable. *Transamerican Freight v. Brada Miller, supra; Gilbertville Trucking Co., Inc. v. United States*, 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); *American Trucking Associations, Inc. v. United States, supra; Performance of Motor Common Carrier Service by Riss & Co., Inc.*, 48 M.C.C. 327 (1948); *Diamond Transportation System, Inc. Ext.-Wis. and Okla. Origin*, 117 M.C.C. 7 (1967).

■ We further hold that the ICC finding that Cape failed to exercise and maintain the necessary control over and the operational responsibility relative to its performance of transportation services under its subject certificates in violation of the provisions of 49 U.S.C.A. §§ 304(a)(1) and 316(b), and 49 CFR § 1057 is supported by substantial evidence and is otherwise lawful.

## II.

We turn now to the issue whether the ICC properly exercised its discretion in entering the order upholding the findings and recommendations of the ALJ and its Division I, requiring Cape to cease and desist from those operations found to be unlawful.

In *Gilbertville Trucking Co., Inc. v. United States, supra,* the Supreme Court ob-

served that the power of the ICC is *corrective* rather than *punitive,* and that the justification for the remedy is the removal of the violation. The court there observed, *inter alia* :

> . . . the choice of remedy is as important a decision as the initial construction of the statute and finding of a violation. The court or agency charged with this choice has a heavy responsibility to tailor the remedy to the particular facts of each case so as to best effectuate the remedial objectives just described. Cf. *Hecht Co. v. Bowles,* 321 U.S. 321, 329– 331, 64 S.Ct. 587, 88 L.Ed. 754.

> 371 U.S. at p. 130, 83 S.Ct. at p. 226.

█ We are not here concerned with deficiencies or inadequacies of service. The record is clear, of course, that Cape has not engaged in any "willful failure" to comply with the Act. No contention is made that Cape's *actual service* rendered, notwithstanding its lack of adequate "control and responsibility" has been other than adequate, economical and efficient in meeting the public interest. Under these circumstances, the discretion to be exercised by the ICC in determining the proper remedy required of Cape to satisfy the "public convenience and necessity" must be scrutinized based upon the entire record leading to the choice made. *Burlington Truck Lines v. United States,* 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

Central to the issue here under consideration, in our view, is the following determination made by the ALJ following the hearing:

## VIII.

In order to insure that the violations cease, there will be entered herein an order requiring Cape to cease and desist all operations found herein to be unlawful. *Also, Cape is hereby admonished to discontinue all operations conducted through the use of "agents," and henceforth its operations must utilize company employees, company terminals, and company vehicles, all of which are under the direct control and supervision of Cape.* (Emphasis supplied.)

[R., Appendix, pp. 240, 241.]

█ Even though it appears that the "blanket" prohibition against use of "agents" above referred to was thereafter tempered by the ALJ's reference to the *Riss* case for "guidance and further adherence" in relation to the control-responsibility requirement, still the all-encompassing admonishment and command above quoted was in fact adopted *without modification* by the ICC. We hold that this all-encompassing prohibition, as commanded by the ALJ and thereafter adopted by the ICC, is clearly erroneous, arbitrary, capricious and unreasonable.

█ It is established that the use of non-owned equipment and non-employee personnel by authorized carriers is not illegal and that the right of a carrier to augment its equipment and personnel by a lease agreement or other like arrangement is specifically authorized by 49 U.S.C.A. § 304(e) and 49 CFR § 1057. *See also: American Trucking Assn's v. United States, supra; Carolina Freight Carriers Corp. v. Pitt County Transportation Company,* 492 F.2d 243 (4th Cir. 1974), *cert. denied,* 423 U.S. 983, 96 S.Ct. 391, 46 L.Ed.2d 301 (1974); *Allstate Insurance Company v. Alterman Transport Lines, Inc.,* 465 F.2d 710 (5th Cir. 1972); *Alford v. Major,* 470 F.2d 132 (7th Cir. 1972). The governing statutes and regulations were intended to assure that authorized, certificated carriers would be responsible *in fact, as well as in law,* for the use and maintenance of leased equipment and the supervision of personnel, such as drivers, supplied by the lessor. Thus, we believe that the effect of the ICC cease and desist requirements, which adopt the ALJ findings and conclusions *in toto,* is to deny Cape the use of agents under any circumstances in the course of its operations. The ICC erred in this regard. Beyond this, we hold that once the ICC had determined that Cape was not guilty of "willful failure" to comply with the Act, the thrust or goal of the ICC's governing activities in the public interest should have been expeditiously di-

**182**

rected to remedies to be undertaken by Cape in order to meet the "control" and "responsibility" requirements. Surely, this could have been accomplished under the guidelines of the Offer of Settlement tendered by Cape to the ICC on January 28, 1975. That offer was accepted by the ICC's Bureau of Enforcement after it had conducted extensive investigations into Cape's operations, following the initial complaint filed against Cape. The terms of the "Offer of Settlement" are all-encompassing. They thus provide, in our view, an ideal springboard for administrative directives in specific areas relating to the degree and nature of the "control" and "responsibility" deemed necessary. We believe that the ICC's acceptance of the "Offer of Settlement" would have accomplished the proper *remedial goal* required. Such is evidenced, in our view, by the extensive changes made by Cape as reported to the Bureau of Enforcement on November 20, 1974, *supra.* Thus, we hold that the ICC abused its discretion when it refused to accept Cape's "Offer of Settlement" in accordance with the Bureau of Enforcement recommendation.

The respective orders of the ICC here under review are, accordingly, set aside. The ICC is directed to undertake such further proceedings necessary to effect the acceptance of Cape's "Offer of Settlement" tendered on January 28, 1975, subject to such reasonable administrative directions, commands and advisements the ICC deems necessary in order to eliminate Cape's failure to exercise that degree of control and responsibility required for the proper performance of its operations under Cape's certificates and authorities contained in MC–134906 and Subs 1, 2, 4 and 5 thereunder.